**Michael A. LIEBNER, Appellee,**

v.

**Hilary E. SIMCOX, Appellant.**

Superior Court of Pennsylvania.

Argued April 22, 2003.

Filed Oct. 8, 2003.

Kenneth A. Wise, Harrisburg, for appellant.

Edward J. Mimnagh, Hershey, for appellee.

BEFORE: HUDOCK, TODD, and POPOVICH, JJ.

OPINION BY TODD, J.:

¶ 1 Hilary E. Simcox ("Mother") appeals the portion of the July 16, 2002 custody order granting Michael A. Liebner ("Michael") visitation with her son, Christian, born July 22, 1992. For the reasons set forth below, we affirm the trial court's custody order.

¶ 2 The trial court accurately set forth the factual background of the instant case as follows:

Michael first met Hilary [Mother] and three-year-old C.M. [Christian] in 1995 while photographing the pair at a J.C. Penney studio. They dated and later commenced living together in the Spring of 1996. Around that time, they learned Hilary was pregnant with A.L. [Alidia Liebner], who was born December 15, 1996. According to Michael, the parties discussed Michael's adoption of C.M., but it never came to fruition.

After A.L.'s birth, the four of them lived together for more than two years. During this time, C.M. called Michael "dad," and referred to Michael's parents as "grandma" and "grandfather." Also during their cohabitation, Michael was recognized as C.M.'s father at family birthday parties, by kindergarten teachers and babysitters. C.M. has recognized Michael's family as part of his own family, and has spent time with them during vacations, holidays and birthdays.

On June 8, 1997, C.M. and A.L. were baptized in the Roman Catholic Church. The baptisms were set up by Michael's parents, who are Catholic. Hilary, who

is not Catholic, acquiesced to the baptisms. An original baptismal certificate named C.M.'s biological father as his father. According to Hilary, this greatly upset Michael, who was able to obtain a second certificate from the church indicating that he was C.M.'s father.

At some point after A.L. was born, Hilary began working full time. Michael, who co-owned a photography business, worked there part-time and was also collecting partial unemployment compensation. During the day, the children were generally cared for by a babysitter, although, occasionally, Michael would watch them. According to Michael, in October 1998, when the parties were having difficulties, Hilary asked, and Michael agreed, that he would act as C.M.'s father if they split up.

In February 1999, the parties separated and Hilary took primary physical custody of both children. Michael, however, maintained regular contact with C.M. for the next three years, through February 24, 2002. The parties agreed to an arrangement whereby Michael would assume physical custody of C.M. whenever he had physical custody of A.L., usually on alternating weekends, as well as some holidays and vacations. Michael provided almost all the transportation for these visits.

On December 15, 2001, Hilary married her current husband, George [Simcox]. By all accounts, C.M. has developed a positive and loving bond with George, whom he recently began to refer to as "dad," and desires to be adopted by him. C.M. currently refers to Michael as "Mike." George testified that C.M. told him that Michael gets very upset at C.M. when he refers to George as his "dad." Hilary and George have had both C.M. and A.L. "dedicated" into their Baptist Church, which means they have pledged to raise the children in a Christian environment and as members of the church.

Michael's contact with C.M. ended abruptly on February 24, 2002, when, upon returning C.M. and A.L. to Hilary following weekend visitation, Michael was told by George that he was no longer welcome there. Hilary also refused to permit Michael to speak with C.M. on the phone. Hilary appears to have terminated contact upon learning that Michael permitted his attorney to ask C.M. questions concerning custody issues. Prior to that, she let C.M. decide whether to visit Michael, and that [sic], except for all but a few occasions, C.M. wanted to visit him. However, according to numerous accounts, the incident with the attorney appears to have had a great impact upon C.M., who felt pressure to answer questions and thereafter decided he no longer wanted to visit Michael. Hilary claims she will adhere to her son's wishes as to future visits with Michael.

(Trial Court Opinion, 11/25/02, at 2–3 (record citations omitted).)

¶ 3 On February 26, 2002, Michael filed a complaint for custody. Following a trial on July 10, 2002, the trial court issued an order awarding Michael and Mother shared legal and physical custody of A.L. The order also awarded Mother sole legal and physical custody of C.M., but awarded Michael visitation with C.M. on alternating weekends and as C.M. wishes. It is the visitation portion of the custody order that is the subject of Mother's appeal, in which she presents the following questions for this Court's review:

1. Has Appellee, Michael Liebner, satisfied his burden of showing he has standing through attaining *in loco parentis* status?

2. Assuming Michael Liebner had obtained *in loco parentis* status, has that status been lost by a change in circumstances?

3. Even assuming Michael Liebner has *in loco parentis* status, is it in the best interests of Christian for him to be forced to visit against his desires?

4. Does the order of the court below [impermissibly] intrude into Appellant, Hilary Simcox's constitutional right to privacy of the family?

(Mother's Brief at 7.)

¶ 4 Preliminarily, we note that an appellate court's standard of review of custody order is of the broadest type, and:

the appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

*MacDonald v. Quaglia,* 442 Pa.Super. 149, 154, 658 A.2d 1343, 1345–46 (1995). The standard of review of a visitation order is the same as that for a custody order. *Id.* at 154, 658 A.2d at 1346.

¶ 5 With regard to Mother's first issue, namely, whether Michael has legal standing to seek visitation with Christian, we note that

there is a stringent test for standing in third-party suits for visitation or partial custody due to the respect for the tradi-

tionally strong right of parents to raise their children as they see fit. The courts generally find standing in third-party visitation and custody cases only where the legislature specifically authorizes the cause of action. A third party has been permitted to maintain an action for custody, however, where that party stands *in loco parentis* to the child.

*T.B. v. L.R.M.,* 567 Pa. 222, 228, 786 A.2d 913, 916 (2001) (citations omitted). Persons other than biological parents are third parties for purposes of custody disputes. *Id.* (citing *Gradwell v. Strausser,* 416 Pa.Super. 118, 122, 610 A.2d 999, 1001 (1992)).

¶ 6 As our Supreme Court explained in *T.B. v. L.R.M.,* "[i]n loco parentis is a legal status and proof of essential facts is required to support a conclusion that such a relationship exists." 567 Pa. at 228, 786 A.2d at 916. (citation omitted). Furthermore,

[t]he phrase *"in loco parentis"* refers to a person who puts oneself in the situation of a lawful parent by assuming the obligations incident to the parental relationship without going through the formality of a legal adoption. The status of *in loco parentis* embodies two ideas; first, the assumption of a parental status, and, second, the discharge of parental duties. The rights and liabilities arising out of an *in loco parentis* relationship are, as the words imply, exactly the same as between parent and child. The third party in this type of relationship, however, can not place himself *in loco parentis* in defiance of the parents' wishes and the parent/child relationship.

*Id.* at 228–29, 786 A.2d at 916–17 (citations omitted). Our Supreme Court, however, also has acknowledged:

The *in loco parentis* basis for standing recognizes that the need to guard the

family from intrusions by third parties and to protect the rights of the natural parent must be tempered by the paramount need to protect the child's best interest. Thus, while it is presumed that a child's best interest is served by maintaining the family's privacy and autonomy, that presumption must give way where the child has established strong psychological bonds with a person who, although not a biological parent, has lived with the child and provided care, nurture, and affection, assuming in the child's eye a stature like that of a parent. Where such a relationship is shown, our courts recognize that the child's best interest requires that the third party be granted standing so as to have the opportunity to litigate fully the issue of whether that relationship should be maintained even over a natural parent's objections.

*Id.* at 230, 786 A.2d at 917 (quoting *J.A.L. v. E.P.H.*, 453 Pa.Super. 78, 88–89, 682 A.2d 1314, 1319–20 (1996)).

¶ 7 In *Bupp v. Bupp,* 718 A.2d 1278 (Pa.Super.1998), for example, we concluded that the mother's live-in paramour had standing to seek partial custody of the mother's child because he had acquired *in loco parentis* status by having assumed and discharged parental duties with the consent of the biological mother, despite the fact that the parties lived together for only one year. We stated:

An important factor in determining whether a third party has standing is whether the third party lived with the child and the natural parent in a family setting, irrespective of its traditional or nontraditional composition, and developed a relationship with the child as a result of the participation and acquiescence of the natural parent.

*Id.* at 1281 (citation omitted).

¶ 8 In the instant case, Mother contends that the trial court erred in determining that Michael stood *in loco parentis* to Christian, and, as a result, had standing to seek visitation with Christian. In support of its determination to the contrary, the trial court stated:

[Mother] contends that Michael did not adequately prove an *in loco parentis* relationship. Specifically, she claims he failed to establish that he acted in any significant way in the role of a substitute parent, or ever became an integral part in C.M.'s life. This assertion is contrary to the credible evidence. Between approximately the Spring of 1996, through February 24, 2002, Michael both assumed a parental status and discharged parental duties. Beginning with the parties'. cohabitation, through February of 1999, a period of approximately three years, the parties lived together with C.M., and later with A.L., as a family unit. C.M. referred to Michael as his "dad" and was treated by Michael's extended family as their own. Furthermore, Michael was recognized in the community and in his church as C.M.'s father. Following their separation, the parties agreed to continued contact between Michael and C.M., which occurred on a regular basis for another three years.

(Trial Court Opinion, 11/25/02, at 6.)

¶ 9 Mother, however, argues that none of the factors relied upon by the trial court, singly or in combination, supported the court's determination that Michael stood *in loco parentis* to Christian. We cannot agree. For example, Mother asserts that during the time the parties lived together, with Mother working full-time and Michael working part-time and collecting partial unemployment compensation, Michael only occasionally cared for the children, and that they were generally cared for during the day by a babysitter.

As a result, Mother argues that the parties did not live together as a family unit. In *J.A.L., supra,* however, we held:

[t]he fact that E.P.H. was the child's primary caregiver, or that other friends also helped out with the new baby, does not diminish the fact that J.A.L. lived with the child for the first ten months of its life, acting as a parenting partner to the child's mother and creating the opportunity for bonding to occur.

*J.A.L.,* 453 Pa.Super. at 92, 682 A.2d at 1321–22.

¶ 10 Furthermore, to the extent Mother suggests that a finding that Michael had attained *in loco parentis* status with respect to Christian was precluded based on the fact that Michael denigrates Mother when Christian visits him, that Christian has not expressed a desire for visitation with Michael, and that Michael previously engaged in criminal activities, we note that these factors are not material to a determination of whether Michael stands *in loco parentis* to Christian.

¶ 11 We also reject Mother's argument that even if Michael had obtained *in loco parentis* status, such status has been lost by a change in circumstances, namely, the parties' separation and Mother's remarriage to George Simcox. First, Mother cites no case law to support the theory that once *in loco parentis* status has been obtained, it can be lost due to changes in circumstance. Furthermore, even if that were the case, we note that the record does not support a conclusion that Michael's *in loco parentis* status has been lost. Indeed, as the trial court noted, Michael maintained regular contact with Christian for three years following the parties' separation. During that time, Michael had custody of Christian whenever he had physical custody of Christian's half-sister Alidia, usually on alternating weekends and on some holidays and vacations.

Michael's contact with Christian ended on February 24, 2002, when Michael was told by George Simcox that he was no longer welcome, and Mother refused to permit Michael to speak with Christian on the phone. Prior to Mother's termination of Christian's visitation with Michael, she let Christian decide whether to visit Michael, and, on all but a few occasions, Christian wanted to visit him. To the extent Mother argues that Christian no longer wishes to visit Michael, we again note that this factor is not relevant to a determination of whether Michael stands *in loco parentis.* Thus, for all of the reasons set forth above, we hold that the trial court did not err in concluding that Michael stood *in loco parentis* to Christian, and, therefore, that Michael had standing to seek visitation with Christian.

¶ 12 We now must determine whether court-ordered visitation with Michael is in Christian's best interest. Visitation is defined as "[t]he right to visit a child. The term does not include the right to remove a child from the custodial parent's control." 23 Pa.C.S.A. § 5302. As we explained in *MacDonald v. Quaglia,* "in a visitation case, the burden is on the third party to show only that it is in the child's best interest to give some time to the third party." 442 Pa.Super. at 153–54, 658 A.2d at 1345 (citations omitted). This Court also has recognized that "[e]xcept under unusual circumstances, no child should be cut off entirely from one side of its family." *Id.* at 155, 658 A.2d at 1346. After much consideration and a review of the record in the instant case, we agree with the trial court's determination that visitation with Michael is in Christian's best interest:

Michael ... has been a consistent and important parental presence in C.M.'s life for over six years, including during formative years (from the age of 3½ to 9½). Furthermore, C.M. has indicated

he would like to visit with Michael so long as Michael does not lie or talk badly about his mother. C.M. also desires to visit Michael so he can be with his sister A.L. during her visits with him. *McMillen v. McMillen*, 529 Pa. 198, 602 A.2d 845, 847 (Pa.1982 [1992]) (a child's preference, although not controlling, is an important factor to be carefully considered in determining the child's best interests).

Hilary argues that the evidence showed it was not in C.M.'s best interests to have any visitation with Michael because Michael has demonstrated an inability to manage his personal and business affairs, has manipulated C.M., has potentially exposed C.M. to an unhealthy environment such as pornographic materials, and has been unable to act as a positive role model for C.M.

This court is unsure how Michael's management of his personal and financial affairs is relevant to this court's inquiry into whether it is in C.M.'s best interests to maintain visitation with Michael. There was no evidence presented as to how Michael's alleged failures have harmed or will harm C.M. Hilary's reference to Michael's manipulation of C.M. would appear to be a reference to Michael having had C.M. interviewed by his attorney. Beyond the fact that the interview took place, there is no evidence how this constituted manipulation. Clearly, this event upset Hilary and disturbed C.M. because of his mother's reaction. However, this incident, involving C.M. being asked a few questions by an attorney, was a one-time occurrence, motivated by Michael's desire to retain partial custody/visitation with C.M. There was no evidence of manipulation on Michael's part. As to the pornographic materials, we certainly do not condone possession of such materials, and they are clearly inappropriate for young children. Nevertheless, the evidence indicated the materials were adult pornography which had been hidden by Michael. There was no evidence that C.M. had or has access to such materials.

(Trial Court Opinion, 11/25/02, at 8–9.)

¶ 13 Finally, we reject Mother's claim that the order of the trial court impermissibly intrudes on her right to privacy of family in contravention to the United States Supreme Court's plurality decision in *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). In *Troxel*, the Court held that a Washington statute that provided that any person could petition the court for visitation of a child at any time, and that the court may order visitation rights for any person when such visitation would serve the best interest of the child, was impermissibly broad and violated the substantive due process rights of the child's mother. In *Troxel*, however, the grandparents who sought visitation did so as third parties; there was no allegation or determination that the grandparents stood *in loco parentis* to the children. In contrast, in the instant case, Michael stands *in loco parentis* to Christian, and it is on this basis that he has standing to seek visitation with Christian. As a result, we conclude that *Troxel* is not controlling. Accordingly, for all of the reasons discussed above, we affirm the trial court's order of July 16, 2002.

¶ 14 Order **AFFIRMED**.