**T.B., Appellant,**

v.

**L.R.M., Appellee.**

Superior Court of Pennsylvania.

Argued Feb. 8, 2005.
Filed March 28, 2005.
Reargument Denied June 9, 2005.

Alphonso B. David, New York City, for appellant.

Nicholas Banda, Johnstown, for appellee.

BEFORE: DEL SOLE, P.J., JOYCE and TAMILIA, JJ.

OPINION BY JOYCE, J.:

¶ 1 T.B. (Appellant) appeals the order entered June 21, 2004, which denied her visitation with the minor child, A.M. We reverse and remand with instructions. The factual and procedural history have been thoroughly set forth in this Court's previous decision, *T.B. v. L.R.M.*, 753 A.2d 873 (Pa.Super.2000) (*en banc*) and by the Supreme Court, *T.B. v. L.R.M.*, 567 Pa. 222, 786 A.2d 913 (2001). Accordingly, we shall only present a brief recitation of the events precipitating this litigation.

¶ 2 Appellant and L.R.M. (Appellee) were involved in a long term, committed, lesbian relationship. They decided that they wanted a child. Thus, Appellee was artificially inseminated, and A.M. was conceived and born. Both women acted as parents to the child until their relationship ended when A.M. was three years old. Thereafter, Appellee refused to allow Appellant to see A.M., which prompted the filing of a custody complaint. Appellant prevailed in achieving *in loco parentis* standing to seek custody/visitation, visitation was deemed to be in A.M.'s best interest, and a visitation schedule was implemented. However, Appellee filed an appeal, and a stay of the visitation order was granted by order of this Court.

¶ 3 On appeal, this Court affirmed the trial court's finding that Appellant had standing by virtue of her *in loco parentis* status. However, we noted that the record was devoid of any evidence, other than the bond between Appellant and A.M., that would factor into the best interest of the child analysis. *T.B. v. L.R.M.*, 753 A.2d at 890. We found that the trial court erred in relying solely on the psychological bond evidence to satisfy Appellant's burden relative to A.M.'s best interest. Accordingly, we remanded the case "for an in-depth inquiry into the best interest of the child...." *Id.* at 891. The Supreme Court, which only heard the standing issue, affirmed. *T.B. v. L.R.M.*, 567 Pa. 222, 786 A.2d 913 (2001). Thus, the case was remanded to the trial court.

¶ 4 Upon remand, an evidentiary hearing was held and the hearing officer concluded that it was in the child's best interest to have visitation with Appellant. In so deciding, a sole conclusion of law was made: "the Hearing Officer concludes following all the testimony, and review of [the] transcripts and briefs that it would be in the best interest of this child to have another loving person in her life." Report of the Hearing Officer, Docket Entry # 85,

at 2–3.[1] No other factors were cited as support for the best interest of the child analysis.

¶ 5 Appellee filed exceptions to the hearing officer's recommended order. The trial court heard argument on the exceptions on May 26, 2004. The trial court reviewed the entire record, including the transcripts for the hearings held in front of the hearing officer.[2] The trial court also reviewed a psychological report created by Dr. Mark King, who was appointed by the hearing officer to conduct psychological evaluations of Appellant, Appellee and A.M. After reviewing the record, the trial court found that "[Appellant] is certainly fit to exercise partial custody of the child for the purpose of visitation." *Id.* at 6. The trial court also determined that Appellee, through "carefully calculated efforts, successfully alienated the child against [Appellant]." *Id.* at 3. Nonetheless, the trial court concluded:

[B]ecause of [Appellee's] persistent attitude and conduct, I can envision nothing but emotional and psychological turmoil for the child if visits were to be forced, even in a "therapeutic setting," as recommended by the hearing officer. [Appellee] would, I believe, continue her efforts to thwart visitation if visitation were to be ordered. I am convinced that she would continue her course of degrading [Appellant] to the child and that her anger towards [Appellant] would probably blind her to the psychological damage her conduct might cause to her daughter. My concern for the child's psychological well-being will not permit me to order visits. I believe it would be to the child's benefit to have a relationship with [Appellant], but only if

[Appellee] discontinued her efforts to thwart that relationship, which will obviously not happen.

*Id.* at 6. Accordingly, the visitation order was vacated, and Appellant appealed.

¶ 6 Although she presents her issues in three statements of questions involved, the central issue is whether the trial court erred and abused its discretion in denying Appellant visitation. Our standard of review is as follows:

An appellate court's standard of review of [a] custody order is of the broadest type, and:

the appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

*Liebner v. Simcox,* 834 A.2d 606, 609 (Pa.Super.2003) quoting *MacDonald v. Quaglia,* 442 Pa.Super. 149, 658 A.2d 1343, 1345–46 (1995). "The standard of review of a visitation order is the same as that for a custody order." *Id.* (citation omitted).

¶ 7 Appellant's main contention is that the trial court relied on an imper-

---

1. The only other "conclusion of law" states that the child is not a stranger to Appellant and sets forth a proposed visitation schedule.

2. The trial court also noted that "the hearing officer's report is obviously deficient." Trial court opinion, 6/21/04, at 2. We agree with this assertion.

missible factor when granting Appellee's exceptions to the hearing officer's recommendation and in denying Appellant visitation. Specifically, Appellant argues that the trial court abused its discretion when determining that denying visitation was in A.M.'s best interest because of the "emotional and psychological turmoil" Appellee would subject her to due to the animosity that Appellee harbors towards Appellant.[3] We agree.

¶ 8 "It is well-established in Pennsylvania that custody and visitation matters are to be decided on the basis of the judicially determined 'best interests of the child' standard, on a case-by-case basis, considering **all** factors which legitimately have an effect upon the child's physical, intellectual, moral, and spiritual well-being." *Hicks v. Hicks*, 868 A.2d 1245, 1247–48 (Pa.Super.2005) (emphasis added) citing *Zummo v. Zummo*, 394 Pa.Super. 30, 574 A.2d 1130, 1142 (1990). However,

a custodial parent's suspicion of or animosity towards another parent or a third party seeking visitation should not **alone** warrant denial of visitation; otherwise the custodial parent could always effectively deny visitation simply by testifying to suspicion or animosity. Instead of deferring to suspicion or animosity, the hearing judge must try to determine whether there is any basis for these feelings. Stated more broadly, the judge must appraise whether the relationship between the disputing parties has an adverse effect on the child.

*Commonwealth ex rel. Williams v. Miller*, 254 Pa.Super. 227, 385 A.2d 992, 995 (1978) (emphasis added). *See also Plowman v. Plowman*, 409 Pa.Super. 143, 597 A.2d 701, 708 (1991) (mother's refusal to accommodate relationship between father and child alone cannot serve as a basis for deciding custody); *Nancy E.M. v. Kenneth D.M.*, 316 Pa.Super. 351, 462 A.2d 1386, 1388 (1983) (hostilities between the parents are relevant only insofar as they constitute a threat to the child or affect the child's welfare); *Dena Lynn F. v. Harvey H.F.*, 278 Pa.Super. 95, 419 A.2d 1374, 1377 (1980) ("of particular relevancy in a case which is so steeped in emotion as this, we must inquire only into relevant facts as

---

**3.** We note that the trial court's conclusion was partly premised on the psychological report generated by Dr. King, who opined that visitation was not in A.M.'s best interest. His opinion was based on two factors: 1) by virtue of the lapse of time and A.M.'s young age when she last saw Appellant, that A.M. would in essence be striking up a relationship with a stranger; and 2) that A.M. would be put in the middle of the conflict between the parties. *See* Report of Dr. King, Docket Entry 84, Exhibit D, at 10. Dr. King also opined he was loathe to reward Appellee for her alienation tactics. Thus, Dr. King offered no conclusion to the court as to whether Appellant should be allowed visitation, as he astutely determined that the issues involved were not psychological, but legal and social.

Initially, we note that, while psychiatric considerations may very well be important, they must not be made determinative, for in deciding upon a child's best interest the court must take many factors into account. *In re Donna W.*, 325 Pa.Super. 39, 472 A.2d 635, 644 (1984). This is so because often times "psychiatry and the law are not co-extensive." *Id.* citing *Commonwealth ex rel. Grimes v. Yack*, 289 Pa.Super. 495, 433 A.2d 1363 (1981).

This case presents a prime example of how psychiatry and the law are not co-extensive. As to the first basis for the opinion, long periods of separation that result in estrangement do not prejudice a petition for visitation when caused by alienation or other factors beyond the control of the person *in loco parentis*. *Bresnock v. Bresnock*, 346 Pa.Super. 563, 500 A.2d 91, 95 (1985); *In re James John M.*, 333 Pa.Super. 417, 482 A.2d 637, 640–641 (1984) The second basis of the opinion is also not legally cognizable, as discussed *infra*. Thus, reliance on Dr. King's "opinions" is misplaced; although they are relevant in some contexts, they are unsupported by law.

they affect the relationship between parent and child not parent and parent or parent and stranger to that intimate relationship").[4]

¶ 9 Clearly, despite finding that Appellant "is fit to exercise custody of the child for the purpose of visitation" and that "it would be to the child's benefit to have a relationship with [Appellant]" it was Appellee's anger towards Appellant that controlled the outcome of the trial court's decision. This factor alone is not a basis upon which to deny visitation. Only where there is evidence that the relationship adversely affects the child should this factor be considered. Even then, it is only one of several factors that constitute a full analysis of a child's best interest.

¶ 10 We note that the record is devoid of any evidence of the adverse effect the relationship between Appellant and Appellee is having upon A.M. The court merely speculated that there would be continuing conflict and that A.M. would be "damaged" by the negativity. However, it must be remembered that every custody dispute, by its very definition, is embroiled with strong emotions. Many involve recalcitrant parents who would go to any lengths to prevent the other party

from having contact with the child. In some cases, a parent who puts his or her own feelings before that of a child will denigrate or berate the other party to the child and make efforts to sabotage the other party's relationship with the child. In those situations, it is the function of the court to rein in the offending party. This can be accomplished through a court order directing the parties to speak neutrally of each other and to not impede the relationship the child has with the other party. *See Fernald v. Fernald,* 224 Pa.Super. 93, 302 A.2d 470, 471 (1973) (directing mother to cease efforts to prevent visitation and communication and to require her children to attend visitation with their father). If the parent is non-compliant with the order, this may be a factor to consider in modifying the custody order. *Clapper v. Harvey,* 716 A.2d 1271, 1275 (Pa.Super.1998). What the court is not to do, however, is to endorse such behavior by basing an order denying custody or visitation solely on the animosity felt by one party towards the other and the alienation that resulted from it, especially in the absence of evidence that the child is negatively affected.[5]

¶ 11 Moreover, the application of these principles is logical in a best interest of the

4. We are cognizant of our Supreme Court's decision in *Commonwealth ex rel. Zaffarano v. Genaro,* 500 Pa. 256, 455 A.2d 1180 (1983). There, the *mutual* animosity between the maternal grandparents and the father was found to be a sufficient basis upon which to deny custody. However, in *Bucci v. Bucci,* 351 Pa.Super. 457, 506 A.2d 438 (1986), *Zaffarano* was distinguished because the ill feelings were only one-sided. We find that *Bucci* is more akin than *Zaffarano* since, like *Bucci,* the animosity in this case is one-sided on the part of Appellee and Appellant has never been found to harbor negative feelings towards Appellee.

5. Imagine a scenario where the same premise is applied to spouses. It is inconceivable that an embittered spouse who successfully es-

tranges the children from the other spouse, to the point where the other spouse is unknown to the children, should be rewarded by a determination that it shall be in the best interest of the children not to have any relationship at all with the alienated spouse because of the custodial spouse's feelings. The preposterousness of this scenario is equally applicable to the case at bar, despite Appellant's non-traditional status. Appellant has, after all, been deemed to have standing to pursue visitation or custody by virtue of her *in loco parentis* relationship with A.M. and the rights of persons standing *in loco parentis* are "exactly the same as between parent and child." *Liebner, supra,* 834 A.2d at 609 (citation omitted).

child analysis. Here, Appellant and A.M. had a loving and bonded relationship where Appellant was viewed by A.M. in a parental role. The record evidences that much of Appellee's motivation to shield A.M. from Appellant was due to Appellant's philandering. While it is human nature to want to punish one who has violated a trust, in reality it is not in a child's best interest to have the offending party estranged from his or her life.

¶ 12 In sum, we find that the trial court only relied on one factor in denying Appellant visitation—Appellee's' animosity towards Appellant and the possible ramification the negative feelings might have on A.M. There is no evidence that the child in fact will suffer from this one-sided stance. Additionally, the trial court is empowered with options to deter the embittered party from infecting the child. No other factors were considered to determine whether it would be in A.M.'s best interest to have Appellant in her life for periods of visitation. Therefore, we find that the trial court abused its discretion in denying Appellant visitation based upon a best interest of the child analysis that was premised on an impermissible factor unsupported by evidence.

¶ 13 Unfortunately, this does not end the inquiry. The reliance on an impermissible factor has rendered the trial court's best interest of the child analysis invalid. The hearing officer engaged in no analysis whatsoever. Consequently, this Court is in possession of a record replete with evidence, but devoid of any viable findings of facts, a best interest of the child analysis, or conclusions of law. Much as we would like to reach a decision as to whether it would be in A.M.'s best interests to visit Appellant so to bring this matter to its conclusion, we as an appellate court are unable to do so. It is well established that we are without authority to make credibility determinations and the findings of fact necessary to the requisite analysis. Consequently, we are constrained to remand this matter once again to the Court of Common Pleas of Cambria County to analyze whether it is in A.M.'s best interests to have visitation with Appellant. *Alfred v. Braxton,* 442 Pa.Super. 381, 659 A.2d 1040, 1042 (1995) ("when an opinion in an child custody matter does not contain an analysis of the record and specific reasons for the court's ultimate decision, the appellate court must remand to the trial court."). Additionally, pursuant to Cambria County's local rule 1915.1(b), the trial court shall exercise its discretion to hear the matter itself instead of appointing a hearing officer.

¶ 14 Turning to a separate matter, on July 29, 2004, Appellant filed for relief from the prior stay that was ordered by this Court in 1997. The stay was ordered when Appellee took her original appeal from the *in loco parentis* finding and visitation order. We denied Appellee's current application for relief without prejudice to raise the matter again in her appellate brief. Appellant has, in fact, raised the issue once more. Appellant's brief, at 32, n. 3. Upon reviewing the record, we find that many of the reasons proffered in support of the stay are no longer valid. Particularly, Appellee's averment that the trial court's grant of *in loco parentis* standing would not likely prevail on the merits on appeal has been disproved. Appellant has been deemed to have *in loco parentis* standing by this Court sitting *en banc* as well as our Supreme Court. Moreover, Appellant twice has been granted visitation of the child by the court of first instance, once in 1997, and then again in 2004. Yet, she has yet to see the child in eight years, save for the one visit to Dr. King's office. Additionally, A.M. is eleven years old now, not a child of the tender age of four that

she was at the time the petition stay was granted. Due to her maturing, many of the concerns that precipitated the stay are no longer viable, especially since the visit between A.M. and Appellant in Dr. King's office went surprisingly well, given that A.M. had no memory of Appellant. Lastly, we recognize the unfortunate delay in bringing this matter to its resolution was created in part by the internal mechanisms of the court system. Because of the necessity of the remand, and the potential for another appeal, this matter will continue unresolved for an indeterminate amount of time and we deem it correct to lift the stay. Accordingly, we order that the stay be lifted and that Appellant is granted visitation with A.M. The visits shall initially occur in a structured, therapeutic setting and at intervals deemed appropriate by the trial court. The visitation schedule shall be graduating, starting out slowly so to acclimate A.M. to this relationship. Appellee shall be cooperative with the visitation schedule and shall not engage in behavior that will negatively impact upon the visitation between A.M. and Appellant. It is ordered.

¶ 15 The order of the trial court denying Appellant visitation with A.M. is reversed. The case is remanded with direction that a thorough analysis of the best interest of the child shall be conducted. The stay of the visitation order entered in 1997 is lifted and a visitation schedule is to be implemented. Jurisdiction is relinquished.

¶ 16 TAMILIA, J., joins and files a Concurring Opinion.

CONCURRING OPINION BY TAMILIA, J.:

¶ 1 I vote to join the majority memorandum but write separately to provide a more specific delineation as to what the trial court must consider in preparing a record upon remand to meet the directions of this Court for a thorough review of the evidence leading to a determination of the best interest of the child regarding visitation. While I am deeply concerned that we are directing removal of the stay placed by the court on visitation before a determination of best interest has been established, I cannot quarrel with the procedure for moving into an exploration of the viability of visitation as proposed in our decision. My other concerns have to do with an adequate exploration of best interest and the aspects of that review which are mandated by our law and standards applicable to this class of case. These will be detailed as I proceed through evaluation of the record and briefs now before us.

¶ 2 As a preface to my review of the briefs and the current, inadequate record, I believe it is helpful to outline the factors which provide a matrix for defining the child's best interest. An important standard in this regard is that promulgated under the Uniform Marriage and Divorce Act (UMDA) which provides, in pertinent part:

UNIFORM MARRIAGE AND DIVORCE ACT (as Amended 1973)

**Section 402. [Best Interest of Child.]**

The court shall determine custody in accordance with the best interest of the child. The court shall consider all relevant factors including:

(1) the wishes of the child's parent or parents as to his custody;

(2) the wishes of the child as to his custodian;

(3) the interaction and interrelationship of the child with his parent or parents, his siblings, and any other person who may significantly affect the child's best interest;

(4) the child's adjustment to his home, school, and community; and

(5) the mental and physical health of all individuals involved.

The court shall not consider conduct of a proposed custodian that does not affect his relationship to the child.

A caveat to (5) would be that any person or persons who would be present during custody or visitation should be evaluated to determine the possible effect on his/her relationship.

**Section 407. [Visitation.]**

(a) A parent not granted custody of the child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would endanger seriously the child's physical, mental, moral, or emotional health.

(b) The court may modify an order granting or denying visitation rights whenever modification would serve the best interest of the child; but the court shall not restrict a parent's visitation rights unless it finds that the visitation would endanger seriously the child's physical, mental, moral, or emotional health.

**Section 408. [Judicial Supervision.]**

(a) Except as otherwise agreed by the parties in writing at the time of the custody decree, the custodian may determine the child's upbringing, including his education, health care, and religious training, unless the court after hearing, finds, upon motion by the noncustodial parent, that in the absence of a specific limitation of the custodian's authority, the child's physical health would be endangered or his emotional development significantly impaired.

(b) If both parents or all contestants agree to the order, or if the court finds that in the absence of the order the child's physical health would be endangered or his emotional devel-opment significantly impaired, the court may order the [local probation or welfare department, or court social service agency] to exercise continuing supervision over the case to assure that the custodial or visitation terms of the decree are carried out.

¶ 3 Despite application of the criteria promulgated under the UMDA, the almost unassailable discretion on the part of the trial judge in weighing the evidence and determining credibility and the impact of expert testimony is still the most critical factor in determining the outcome of these cases. In *Beers v. Beers,* 342 Pa.Super. 465, 493 A.2d 116, 117–118 (1985), this Court stated "[t]he polestar of any child custody [or visitation] dispute is to reach a decision which serves the 'best interests' of the child. Factors to be considered in arriving at such a determination include the child's physical, intellectual, emotional and spiritual well being." *Id.* (citations omitted). *See also Hughes v. Hughes,* 316 Pa.Super. 505, 463 A.2d 478 (1983); *Haraschak v. Haraschak,* 268 Pa.Super. 173, 407 A.2d 886 (1979).

¶ 4 Other considerations are specified in Section 5303, **Award of custody, partial custody or visitation,** of the Domestic Relations Code, 23 Pa.C.S.A. § 101, *et. seq.* In relevant part that section provides:

(a) **General rule.—**

(1) . . . the court shall consider the preference of the child as well as any other factor which legitimately impact the child's physical, intellectual and emotional well being.

(2) . . . the court shall consider . . . among other factors, which parent is more likely to encourage, permit and allow frequent and continuing contact and physical access between the non-custodial parent and the child.

(3) ... consider each parent and adult household member's present and past violent or abusive conduct.

\* \* \*

d) **Sole custody.**—The court shall award sole custody when it is in the best interest of the child.

23 Pa.C.S. § 5303. These provisions are the guides to a comprehensive review which must be followed by the trial judge in establishing a complete record and thereafter, applying his sense of the truthfulness, weight and impact of the evidence on the child's present and future well being.

¶ 5 It appears from the record that the hearing officers adopted in toto appellant's assertions that it would be in A.M.'s best interest to have "another person in her life that loves her and just the experience of the different things with another person besides her own family." N.T., 5/19/03, at 90. This finding and parroting of T.B.'s expression unquestionably was inadequate and was properly rejected by Judge Leahey. Conversely, Judge Leahey, after his hearing *de novo* of the evidence by the parties and reviewing the psychological report by Dr. King, grasped the following statement in the report. *"[I]f you strictly look at the best interest of this particular child, it is clear to me that denying visits would be in the best interest of the child."* Trial Court Opinion, Leahey, J., 6/21/04, at 5 (emphasis by Judge Leahey) *quoting* Psychological Evaluation for Custody, 11/16/02, Mark King, PhD, at 10. Dr. King also made a coherent and persuasive analysis of what had transpired in this case which Judge Leahey acknowledged when he concluded:

Obviously, Dr. King, a respected psychologist, does not wish to reward Defendant for her conduct; neither do I. However, we must look strictly at the

best interest of the child. I agree with Dr. King that denying visits is in the child's best interest. I believe if we were to order visits, that defendant's anger towards plaintiff, as Dr. King put it, will continue to 'filter down' to the child and, in my opinion, psychological damage to the child as a result of being placed in the middle of this conflict could easily result.

Trial Court Opinion, at 5–6.

¶ 6 It is beyond question that Dr. King and Judge Leahey derived appropriate conclusions from the testimony, observations and findings supported by the record. Having said this, it is not beyond requiring further exploration, analysis and judicial efforts to determine if there does not remain a path which can be opened to providing visitation while protecting the child's best interest. That is not to say that upon pursuing further hearings and exposition of the child's predicament in this matter, an ultimate conclusion, beyond a preponderance of the evidence, would militate against visitation, but it appears the majority is correct in pursuing a remand for that purpose.

¶ 7 Dr. King in his report is not evading the tenants of psychological principles nor is he ignoring the legal concept of best interest. As quoted by the trial court, he states "There is a number of social policy issues here that make it difficult to feel comfortable saying that these visits should not take place. One of these is the blatant alienation by the mother. All psychologists, especially this one, are loathed to reward such behavior..." Trial Court Opinion, at 5.

¶ 8 Pursuing the major tenets established by the UMDA and statutory and case law, which attempt to establish parameters for the core value pertinent to custody and visitation, the best interest of the child, each child and each case pres-

ents a unique set of circumstances. Dr. King undoubtedly was aware of, and to some degree guided by, the concepts promulgated by the seminal works *Before the Best Interests of the Child* and *Beyond the Best Interests of the Child.*[6] The paramount goal these and most experts currently perceive is continuity in the child's environment and permanence in its psychological attachments. This necessarily involves a substantial deviation of the claim of at least one of the parents (natural or psychological). "[T]he psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood." *Hoy v. Willis,* 165 N.J.Super. 265, 398 A.2d 109, 112 (1978) quoting *Beyond the Best Interests of the Child.* To provide full effect to the tenets of psychiatric truth, i.e. continuity and relegating to the blood tie a mythological dimension—most courts attribute a basic cultural truth to blood ties and are reluctant to embrace the new "findings" in favor of biological strangers. In the legal tenets which guide our custody and visitation proceedings, the parents have constitutional rights, as should the child. *McGaffin v. Roberts,* 193 Conn. 393, 479 A.2d 176 (1984) (stating that *in loco parentis* status does not carry the same weight as does biological parentage but in some cases *in loco parentis* prevails.)

¶ 9 While no definitive constitutional weight has been attributed to the rights of the child in custody cases, it has been ascribed to the rights of children in juvenile cases. *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). Biological fathers, even those not members of the child's home or family, retain rights in paternity, termination and adoption cases

effecting their children. *See Little v. Streater,* 452 U.S. 1, 101 S.Ct. 2202, 68 L.Ed.2d 627 (1981); *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).

¶ 10 Perusing the significant, relevant focus of concerns in this case are the following:

1. *Fitness and qualifications* of the natural and *in loco* parents. This element was left largely unexplored, it being assumed throughout that both were competent in this regard. With regard to this aspect, the court should consider the family members, significant others, and others who, based upon the social circumstances, will likely interact with the child.

2. *The wishes of the child's parents as to custody and visitation.* This factor has been explored. The extensive and somewhat bitter litigation, spanning many years, through several trial court and appellate proceedings, is testimony to the desire of the natural mother and appellant, the *in loco* parent, to have custody of, or at the very least, regular interaction with A.M. As with exploration of fitness and qualifications (# 1 above) the lifestyle and values of the *in loco* parent, as they comport with or conflict with the custodial parent, must be carefully scrutinized and evaluated as to their impact on the child. There is ample precedent that if grandparents have acquired *in loco* status and thereby have standing to pursue partial custody or visitation, behavior or activities of the grandparents which is conflicting or interfering with the natural parent's reasonable rearing values and activity, can result in denial of visitation and/or partial custody.

**6.** Joseph Goldstein (Law School, Yale University), Anna Freud (Hampstead Child Therapy Clinic) Albert Solnit (Child Study Center, Yale University), *Before the Best Interest of the Child* and *Beyond the Best Interests of the Child* (The Free Press 1973, 1979).

¶ 11 In *Beyond the Best Interests of the Child*, *supra*, the authors speak unfavorably about visitation stating:

> In addition, certain conditions such as visitations may themselves be a source of discontinuity. Children have difficulty in relating positively to, profiting from, and maintaining the contact with two psychological parents who are not in positive contact with each other. Loyalty conflicts are common and normal under such conditions and may have devastating consequences by destroying the child's positive relationships to both parents. A "visiting" or "visited" parent has little chance to serve as a true object for love, trust, and identification, since this role is based on his being available on an uninterrupted day-to-day basis.
>
> Once it is determined who will be the custodial parent, it is that parent, not the court, who must decide under what conditions he or she wishes to raise the child. Thus, the noncustodial parent should have no legally enforceable right to visit the child, and the custodial parent should have the right to decide whether it is desirable for the child to have such visits.

*Id.* at 37–38.

¶ 12 3. *The wishes of the child as to his custodian (visitation).* This becomes an important inquiry as the child has been virtually uninvolved in interaction with T.B. and was uncomfortable with her on the occasion she was in her presence. There was meaningful co-parenting from A.M.'s birth on August 27, 1993, until T.B. left the lesbian relationship in the summer of 1996 to be with another woman.

L.R.M. thereafter denied T.B. permission to see or be involved with A.M., on the basis that L.R.M. "was the only parent." L.R.M. thereby alienated A.M. from T.B. During the intervening almost nine years, the case has been involved in bitter litigation to determine initially whether T.B. had standing, and thereafter to determine whether it would be in A.M.'s best interest to have visitation with T.B. Since visitation and/or custody are determined on the narrowest of legal standards between parties with equal right to the custody of a child (two natural parents or parents through adoption) which is preponderance of the evidence, the preference of the child becomes extremely important. Additionally, one of the few presumptions remaining in relation to child custody is that of the superior right of a natural parent over third parties, even those standing *in loco parentis*. See *Charles v. Stehlik*, 560 Pa. 334, 340, 744 A.2d 1255, 1258 (2000); *Ellerbe v. Hooks*, 490 Pa. 363, 416 A.2d 512 (Pa.1980).[7] Also, when *in loco parentis* is sought based upon co-parenting in the mother's home, there is a question whether this can be established. Delegation of much of the day-to-day child care by a parent does not necessarily place the caretaker *in loco parentis* to the child where the parent continues to exercise control over the child's care. See *Argenio v. Fenton*, 703 A.2d 1042 (Pa.Super.1997); *Porch v. Porch*, 327 Pa.Super. 346, 475 A.2d 831 (1984). The absence of any responsibility on T.B.'s part for the care of A.M. for almost nine years can only weaken the standing and reliance upon *in loco parentis* as the basis for the claim of right to

---

7. As this Court noted in *In re Slaughter*, 738 A.2d 1013 (Pa.Super.1999), our Supreme Court in *Rowles v. Rowles*, 542 Pa. 443, 668 A.2d 126 (1995) purported to abolish the presumption in favor of natural parents in custody determinations. "The Supreme Court has noted on numerous subsequent occasions, however, that the alleged abolishment was part of a plurality decision that did not command a majority of the justices. It is therefore not binding precedent and the rule of *Ellerbe* [*v. Hooks*, 490 Pa. 363, 416 A.2d 512 (1980)] remains in force in Pennsylvania." *Slaughter, supra*, at 1018, n. 6.

visitation, particularly in light of the child's preference and the natural mother's opposition to a renewal of the relationship. Likewise, in the three classes of relationships, 1) those between parents, 2) those between parent and state, and 3) those between parents and third parties, persons other than parents are treated as third parties for purposes of custody disputes, regardless of the degree of the relationship, although the relationship to the child is a factor to be considered by the court. *In re Custody of Hernandez*, 249 Pa.Super. 274, 376 A.2d 648 (1977). Thus, while T.B. has been granted standing to entertain a visitation action in regarding to A.M., this does not resolve the issues relating to best interest and the proof of those elements by a preponderance of the evidence. Finally, the age of the child, her maturity and the soundness of her reasons in favor of or against visitation are significant factors which the trial court must weigh carefully. A.M. is approaching the age where her preference becomes more compelling despite the reason leading up to the long distancing between her and T.B. In *In re Seiferth*, 309 N.Y. 80, 127 N.E.2d 820 (1955) and *In re Green*, 448 Pa. 338, 292 A.2d 387 (Pa.1972), the courts refused to authorize surgery which was not immediately life threatening when the children (Seiferth, age 14, and Green, age 16) refused surgery and the courts believed both were of an age that they should be heard.

¶ 13 Returning to the rationale of the experts who authored *Beyond the Best Interests of the Child*, it firmly and clearly sets forth the effect of presence or absence in the caretaking relationship as follows:

> Whether any adult becomes the psychological parent of a child is based thus on day-to-day interaction, companionship, and shared experiences. The role can be fulfilled either by a biological parent or by an adoptive parent or by

any other caring adult—but never by an absent, inactive adult, whatever his biological or legal relationship to the child may be.

*Id.*, at 19. A final note from the analysis and recommendations of *Beyond the Best Interests of the Child*, which is generally unaccepted in legal or constitutional considerations, is as follows:

> Once it is determined who will be the custodial parent [determined by agreement of the parties or by the court in contested cases] it is that parent, not the court, who must decide under what conditions he or she wishes to raise the child. Thus, the noncustodial parent should have no legally enforceable right to visit the child, and the custodial parent should have the right to decide whether it is desirable for the child to have such visits.[10]

> 10. [This concept is contained in The Civil Code of Japan (Supreme Court of Japan, Tokyo, Official English Translation, pp. 152–153—Articles 818–821).]

*Id.*, at 38.

¶ 14 Thus, it is evident there is a clear dichotomy between the principles which are deemed fundamental in dealing with contested custody/visitation cases through the courts as opposed to psychological/child parenting concepts. At best we can only hope to bridge the differences and in doing so apply the doctrine of the least detrimental available alternative. The authors of *Beyond the Best Interests of the Child*, in their *"Provisions for a Model Child Placement Statute,"* describe this paradigm as follows:

> The least detrimental available alternative is that child placement and procedure for child placement which maximizes, in accord with the child' sense of time (which is based on the urgency of his or her instinctual and emotional

needs which differ from those of an adult) the child's opportunity for being wanted and for maintaining on a continuous, unconditional and permanent basis, a relationship with at least one adult who is or will become the child's psychological parent.

*Id.,* at 99 ¶ 10.6. In a custody dispute, the intervenor, that is the adult seeking custody, must establish that he or she is the least detrimental available alternative. *Id.,* at 100. While the above principles are stated differently than the best interest standards of the UMDA, they are not irreconcilable with them.

### Standard regarding *in loco parentis* and natural parent

¶ 15 As between parents, after hearing evidence regarding best interest, a judge awards custody according to whether evidence scales tip to mother or father's side. When the judge hears a dispute between parents and a third party, it is more complex. The question still is what is in child's best interest, however, the parties do not start even—the parent has a *prima facie* right to custody, which will be forfeited only if "convincing reasons" appear that the child's best interest will be served by an award to the third party. *See Ellerbe, supra.* Thus, even before the proceedings start, "the evidentiary scale is tipped, and tipped hard, to the parents' side." *Hernandez, supra,* at 654. What the judge must do, therefore, is first hear all the evidence relevant to the child's best interest, and then decide whether the evidence on behalf of the third party is weighty enough to bring the scale up to even, then down on the third party's side. Although there are two distinct categories of third parties—relative and non-relative—both types, must show "convincing reasons" why the natural parent should not have custody of the child. *See Hernandez,* at

655; *Liebner v. Simcox,* 834 A.2d 606 (Pa.Super.2003).

¶ 16 As to the application of *Hernandez* and *Ellerbe* to this case, this Court in *J.A.L. v. E.P.H.,* 453 Pa.Super. 78, 682 A.2d 1314 (1996), adopted the use of the term *"prima facie* right to custody" in the context of a standing inquiry as between the right of a non-parent and that of a biological parent in determining custody or visitation rights. The *J.A.L.* Court stated,

In this latter context [determining custody as opposed to establishing standing] the natural parent's *'prima facie'* right to custody has the effect of increasing the evidentiary burden on the non-parent seeking custody." *Hernandez* and *Ellerbe, supra. See Campbell v. Campbell,* 448 Pa.Super. 640, 672 A.2d 835 (Pa.Super.1996) (natural mother confused principles of standing with standard to be applied in deciding custody dispute); *Walkenstein v. Walkenstein,* 443 Pa.Super. 683, 663 A.2d 178 (Pa.Super.1995) (same). Appropriate deference to the parent's right to custody thus does not require that all third parties be denied standing, or even that standing rules be applied in an overly stringent manner; the increased burden of proof required of third parties seeking custody rights provides an additional layer of protection for the parent. *See Kellogg v. Kellogg,* 435 Pa.Super. 581, 646 A.2d 1246, 1249 (Pa.Super.1994) (third parties who establish standing by virtue of *in loco parentis* are not elevated to status of natural parent in determining merits of custody dispute); *Com. ex rel. Patricia L.F. v. Malbert J.F.,* 278 Pa.Super. 343, 420 A.2d 572 (Pa.Super.1980).

*J.A.L.,* at 1319 (footnote omitted). Our Supreme Court relied heavily on *J.A.L.* in its decision in this matter and must be construed to adopt the analysis above from

*J.A.L. T.B. v. L.R.M.,* 567 Pa. 222, 786 A.2d 913 (2001).

¶ 17 Finally, this Court in *J.A.L.* reiterates our holding as to the standard to be applied *vis a vis* standing and the claim for partial custody as against the child's biological parents.

> We emphasize once again that our determination today does not change the standard applicable to J.A.L.'s claim for partial custody as against the child's biological parent. J.A.L., although in loco parentis for standing purposes, remains a third party for purposes of evaluating her claim for partial custody. *Kellogg v. Kellogg,* [435 Pa.Super. 581, 646 A.2d 1246 (Pa.Super.1994)].

*J.A.L.,* at 1322, n. 7. Accordingly, third parties who establish standing by virtue of *in loco parentis* are not elevated to status of natural parent in determining merits of custody dispute.

¶ 18 With the above depiction of the applicable parameters and standards which apply in determining the best interests of the child with regard to visitation, there remains one additional category of evidentiary review which must be weighed by the trial court. The court must consider the factors as set forth in the UMDA Sections 402(4) and 402(5) and in 23 Pa. C.S. § 5303(a)(1). The UMDA requires a court to consider the child's adjustment to his/her home, school, and community (§ 402(4)) and the mental and physical health of all individuals involved (§ 402(5)). Pennsylvania's Domestic Relations Code provides, "[i]n making an order for custody or partial custody, the court shall consider the preference of the child as well as any other factor which legitimately impacts the child's physical, intellectual and emotional well-being." 23 Pa.C.S.A. 5303(a)(1).

¶ 19 The most problematic consideration before the trial court in weighing the above factors relates to the long if not excessive separation between A.M. and appellant, which vitiates any benefit which might have accrued to their relationship from *in loco parentis* status. Almost nine years have elapsed since any meaningful interaction has occurred between appellant and A.M., and continuation of the alienation and animosity by L.R.M. as to A.M. and T.B. having a meaningful relationship could render all other factors to a large degree meaningless.

¶ 20 The majority's provision for vacation of the stay on visitation with reasonable implementation of a schedule, hopefully supervised and assisted by counseling, is the first step to bring about a fruitful resolution of this problem. The need to go forward with evaluations of the home and school environments must proceed as rapidly as possible without disturbing the child's emotional and physical stability. There must also be an in depth review and evaluation of A.M.'s multiple allergy, asthma and quasi-psychological problems characterized as ADD/ADHD, which must be treated and considered while the attempt to install a visitation program is pursued.

¶ 21 Finally, after there has been a reasonable opportunity to create a visitation program, A.M.'s wishes concerning the visitation and her desire to continue with it must be evaluated. Throughout the process it is evident that court monitoring and counseling will be required to achieve any degree of well-being in the child's best interest.