OPINION BY
McCAFFERY, J.:
¶ 1 Appellant, J.F. (“Father”), asks us to determine whether the trial court erred in holding that D.B. (“gestational carrier”) has standing to seek custody of the triplet boys she carried and delivered, after having taken them from the hospital against Father’s wishes when they were eight days old. In a companion case, an action initiated by gestational carrier, Father appeals from the trial court’s order terminating the parental rights of J.R. (“egg donor”).[1] Following an exhaustive review of the record, the briefs of the parties and the pertinent law, we decline to comment on the validity of surrogacy contracts, either specifically in this case or generally in this Commonwealth. That task is for the legislature. Our holding today is limited to our conclusion that gestational carrier lacked standing to seek custody or challenge Father’s custody of the triplets. As a result, gestational carrier also lacked standing to seek termination of egg donor’s parental rights. Accordingly, we vacate the order of the trial court and remand the matter with directions.
FACTS AND PROCEDURAL HISTORY
¶ 2 The unique facts and procedural history underlying these appeals are as follows. Father is a math professor and department chair at Cleveland State University in Cleveland, Ohio. He lives with E.D., who was a practicing dentist and is now retired. Father and E.D., who live together in a home they built in Ohio, are in a long-term relationship and they want to have children. E.D. is a widow,[2] with two grown children: a daughter, who is married with four children, and a son.[3] (Notes of Testimony (“N.T.”) Custody Trial, 7/9/04, at 112-15; R.R. at 561a-564a). Father has no children. After enduring infertility treatments and learning that E.D. was incapable of conceiving any more children, the couple considered other options. Although willing, E.D.’s daughter was incapable of serving as a surrogate for the couple.
¶ 3 Father and E.D. eventually contacted Surrogate Mothers, Inc. (“SMI”), a private surrogacy agency in Indiana. The couple entered into an agreement with SMI listing Father as “Biological Father or Adoptive Father”, E.D. as “Biological Mother, Adoptive Mother, or Partner”, *1266 and the couple as “Client”. (Agreement Between Client and SMI, Father’s Complaint for Sole Custody, Exhibit A; R.R. at 22a-27a). The Agreement provided that Steven C. Litz, Esquire, director of SMI, would “prepare all legal papers incidental to the legal processes involved” and “represent Client in all of the proceedings contemplated by this agreement”. (Id. at 2-3; R.R. at 23a-24a).
¶ 4 SMI matched the couple with gestational carrier, a married resident of Pennsylvania with three children, of her own, and egg donor, a single woman residing in Texas. E.D. met gestational carrier in April 2002. In August 2002, Father, egg donor, gestational carrier and her husband executed a surrogacy contract (“the Contract” or “the Surrogacy Contract”) prepared by Attorney Litz. By virtue of the Contract Father agreed, inter alia, to pay gestational carrier the sum of $15,000.00 for a single birth, $20,000.00 for multiple births, plus medical expenses, travel expenses, and life insurance for the duration of the pregnancy. (Contract, Father’s Complaint for Sole Custody, Exhibit B; R.R. at 28a-39a). Gestational carrier agreed, inter alia, that she would not attempt to form a parent-child relationship with any child or children she might bear; that she would voluntarily relinquish any parental rights to any such child or children; and Father would not be responsible for any lost wages, childcare expenses for existing children, or any other expenses not expressly set forth in the Contract. (Id. at 1, 3; R.R. at 28a, 30a). In the event that custody was somehow awarded to either gestational carrier or egg donor, each agreed to indemnify Father for any and all monies paid for child support, and reimburse him for any and all monies paid to either one pursuant to the Surrogacy Contract. (Id. at 4; R.R. at 31a). Father agreed to assume legal responsibility for any child or children of his, born pursuant to the Contract, and the Contract also provided that any such child or children should be placed in the sole custody of E.D. if Father were to die before the birth of the child or children. (Id. at 5, 32a). A portion of the Surrogacy Contract contained a Release and Hold Harmless Agreement, which provided as follows:
[Gestational carrier] and [egg donor] will undergo a procedure whereby eggs or ovum from [egg donor] will be combined with sperm from [Father], and the resulting embryo or embryos will be transferred to [gestational carrier] for the purpose of carrying [Father’s] child to term. Upon the birth of the child, [gestational carrier] and/or [egg donor] will surrender any custody rights to the child to [Father]....
(Id. at 9; R.R. at 36a). E.D. sold her dental practice in 2002 in anticipation of being a “stay at home mother”. (N.T. Standing Hearing, 1/29/04, at 7; R.R. at 133a; Hokaj Deposition Testimony (“D.T.”), 8/10/04, at 78; R.R. at 989a).[4]
¶ 5 Pursuant to the Surrogacy Contract, the parties underwent extensive medical and psychological testing. Finally, in April 2003, three of egg donor’s eggs, fertilized in vitro with Father’s sperm, were implanted in gestational carrier. Father and E.D., the intended parents, were present for this procedure as well as four weeks later for the sonogram confirming that gestational carrier was carrying trip *1267 lets. (N.T. Standing Hearing, 3/11/04, at 45, 47; R.R. at 339a, 341a). Intended parents also attended gestational carrier’s first few doctor’s appointments in Erie, Pennsylvania, but were later told by gestational carrier not to come to any more appointments. Thereafter, E.D. called to check on gestational carrier and the triplets she was carrying, apparently more often than gestational carrier liked. She asked E.D. not to call so often, and E.D. complied, as she had complied with the request to stop going to the doctor’s appointments. (Id. at 87; R.R. at 381a). When it became necessary for gestational carrier to go on bed rest on her doctor’s advice, she requested additional money for that period of time. Even though they were not required to do so by the contract, intended parents sent gestational carrier an additional $1,000 for each of the four months she was on bed rest.
¶ 6 As the triplets grew, the doctor became concerned that gestational carrier would go into labor prematurely. Gestational carrier scheduled a caesarean delivery (“C-section”) at Hamot Medical Center (“Hamot” or “the hospital”) in Erie, Pennsylvania, for November 19, 2003, approximately thirty-five (35) weeks into the pregnancy.[5] Although E.D. expressed her desire to be in the delivery room for the birth, gestational carrier wanted her husband there instead, and so gestational carrier did not tell intended parents about the scheduled C-section. (Id. at 57-58; R.R. at 351a-352a). Gestational carrier knew the triplets’ gender, but intended parents chose to wait to find out until the birth. (Id. at 66-67; R.R. at 360a-361a).
¶ 7 On the morning of November 19th, gestational earner called SMI to inform the agency that she would be undergoing a C-section later that day. SMI called intended parents and informed them of this fact. The triplets were, indeed, born on that date, but their early delivery caused minor medical problems that warranted their placement in Hamot’s neonatal intensive care unit (“NICU”). Intended parents, who had only learned about the birth on that same day, drove from Ohio to Erie that evening to visit the babies.[6]
¶ 8 Attorney Litz had informed Paul Huckno, Hamot’s Risk Manager, that a court order naming Father and E.D. as the parents would be forthcoming; however, Hamot did not receive such order. (N.T. Standing Hearing, 1/29/04, at 86, 88; R.R. at 212a, 214a). As a result, the hospital insisted that intended parents have permission from gestational carrier to see the triplets in the NICU, which gestational carrier gave. In addition, gestational carrier signed a form satisfactory to Hamot that allowed Hamot to discharge the triplets to Father. (Id. at 90; R.R. at 216a). On the night of the triplets’ birth, intended parents were able to hold only one son, as the other two were on oxygen.
¶ 9 Over the next few days, while the children were being monitored and cared for by Hamot doctors and nurses in the NICU, intended parents purchased a minivan, car seats, toys, and clothing, all for the care and benefit of the triplets. E.D. made repeated telephone calls to their insurance company to secure medical insurance for the infants and arrange for apnea monitors, which the babies required before they could be discharged from the hospital. E.D. spoke with gestational carrier on No *1268 vember 20th and the 21st. (N.T. Standing Hearing, 3/11/04, at 62-63; R.R. at 356a-357a).[7] E.D. also telephoned Hamot at least once a day, often more frequently, to speak with the babies’ doctors, NICU nurses, and social services personnel.[8] Hamot discharged gestational carrier on Saturday, November 22nd, and she went home. Prior to and at that time, gestational carrier claimed to have had no intention of taking the triplets home with her. She also knew that E.D. was planning to adopt them.[9] (Id. at 61-62, 94; R.R. at 356a-357a, 388a).
¶ 10 Originally, intended parents were scheduled to “nest” with the triplets on Sunday, November 23rd, to prepare to bring them home.[10] However, as intended parents were leaving their home in Ohio that day for the drive to Hamot, Dr. Jonathan Chai called them and explained that nesting had to be postponed, because two of the' boys needed to go back on oxygen and all three had apnea. (Dr. Jonathan Chai D.T. at 19). Dr. Chai also told E.D. that this development meant a delay in discharge until the ■ end of the week. In addition, the couple learned that their mandatory apnea monitor training could not be accomplished on a Sunday. (Id. at 19, 31). In light of these facts, Dr. Chai and E.D. rescheduled the nesting and monitor training for the next day. (Id.).
¶ 11 On Monday, E.D. learned that Ha-mot had not yet secured apnea monitors for the triplets; therefore, nesting was postponed once again.[11] Still back in Ohio, E.D. worked to straighten out some confusion.which existed between the insurance company and Hamot. She was successful, and the hospital rescheduled the nesting and monitor training for Tuesday, November 25th. Hamot staff members were expecting intended parents on Tuesday evening.
¶ 12 In the meantime, gestational carrier was aware that E.D. had spoken with *1269 the Hamot doctors, NICU nurses and social services staff on a daily basis. Nevertheless, gestational carrier did not like what she characterized as a “lack of physical visits” to the NICU on the part of intended parents.[12] (N.T. Standing Hearing, 3/11/04, at 62-63; R.R. at 356a-357a). On Tuesday morning, gestational carrier called Hamot to voice her concerns about the lack of visitation. According to gestational carrier, Huckno, Hamot’s risk manager, told her that she was the legal mother and that, if she wanted to, she could take the babies home. (Id. at 69; R.R. at 363a).
¶ 13 Later that morning, gestational carrier arrived at Hamot to meet with Dr. Michele Chai, NICU nurses and social services to arrange to take the triplets home with her.[13] Gestational carrier expressed her concern about what was going to happen to the children if they were discharged to people who had not visited them frequently in the NICU. Gestational carrier also stated that she believed Father and E.D. were “not fit to be parents.” (Id. at 69, 98; R.R. at 363a, 392a; Dr. Michele Chai Deposition Exhibit “Hospital Record/Nursing Notes”). At that time, gestational canner revoked her consent for intended parents to visit the children. She also arranged to nest with the triplets that night, along with her husband, so that they could take the babies home when they were discharged.
¶ 14 Although gestational carrier notified Attorney Litz at SMI of her decision to take the triplets home, she did not contact intended parents, who were expecting to arrive at Hamot that evening for nesting and training. Anticipating a confrontation, Hamot staff contacted security to alert them to intended parents’ impending arrival. (Dr. Michele Chai Deposition Exhibit “Hospital Reeord/Nursing Notes”). Unaware of these events, intended parents arrived at Hamot late on Tuesday afternoon ready for training and nesting. They were met by Hamot security at the NICU nurses’ station. At the direction of Huckno, Hamot staff told intended parents that the triplets had been discharged to gestational carrier, and they should seek legal advice. (N.T. Standing Hearing, 1/29/04, at 98, 112, 119, 141; R.R. at 224a, 238a, 245a, 267a). E.D. insisted on speaking with Huckno, who verified that the triplets had been discharged to gestational carrier with his consent. In fact, the triplets had not been discharged and gestational carrier was present at the hospital at this time, preparing for her own nesting and training with the babies that evening. Even though Hamot staff had represented to intended parents that the triplets had been discharged to gestational carrier, the triplets remained at Hamot for an additional two days, until Thursday, November 27th.[14] On that day, gestational carrier took the babies from Hamot to her home in Corry, Pennsylvania.
*1270 ¶ 15 Alter being informed of the purported “discharge” of the babies, the bewildered intended parents returned to Ohio and promptly began calling gestational carrier. Each time, they left messages asking for an explanation of gestational carrier’s actions. Gestational carrier did not return any of the calls.
¶ 16 When all their calls to.gestational carrier went unanswered and unreturned, intended parents began contacting attorneys. On December 4, 2003, Father signed a verification in support of a Complaint for Custody and a Motion for Emergency Special Relief naming gestational carrier as the defendant; the papers were filed in the Erie County Court of Common Pleas on December 11, 2003. A consent order promptly followed, granting temporary legal and physical custody of the triplets to gestational carrier, with visitation by Father. The consent order specifically preserved Father’s right to assert that gestational carrier lacked standing to pursue custody. On December 16, 2003, gestational carrier filed an Answer and Counterclaim for Custody. In her Answer, gestational carrier did not challenge the validity of the Surrogacy Contract. Father filed preliminary objections to gestational carrier’s Counterclaim on December 18, 2003, asserting that gestational carrier had no standing to pursue custody.
¶ 17 The trial court held hearings on the issue of standing on December 22, 2003, and January 29 and March 11, 2004. In an opinion filed April 2, 2004, the court, sua sponte, voided the surrogacy contract as against public policy for, among other things, failure to specifically name a “legal mother”, “particularly if something were to happen to. [intended parents], or if they were to decide not to take custody of the children.” (Trial Court Opinion, filed April 2, 2004, at 18). The court summarily eliminated both E.D. and egg donor as possible legal mothers, without sending either woman notice of her right to be heard or to intervene. The court further found gestational carrier was the “legal mother” of the triplets. Finally, the court concluded that gestational carrier “would most likely still have third[-]party standing in loco parentis ” to seek custody, even if she were not the “legal mother” of the children. (Id. at 19; R.R. at 436a).
¶ 18 The court then entered its order finding that gestational carrier had standing to pursue custody and child support based both on her court-conferred status as. “legal mother” and her in loco parentis. status. Father filed a motion with the trial court to permit an immediate appeal from the court’s interlocutory order, but the trial court denied Father’s request and ordered that custody proceedings continue.
¶ 19 The court held hearings on custody on July 9 and July 29, 2004, but did not issue a ruling at that time. In August, gestational carrier commenced proceedings against egg donor, seeking termination of egg donor’s parental rights to the triplets. Father intervened in the termination matter with the consent of all parties and asked that the case be stayed pending resolution of the custody matter. The trial court refused Father’s request to put the termination matter on hold and a hearing was scheduled for April 2005.
¶ 20 Nearly six months after the custody trial had concluded and while the termi *1271 nation proceedings were ongoing, the court issued an order on January 7, 2005 (“Custody Order”), awarding primary physical custody to gestational carrier. The Custody Order also granted Father partial custody/visitation, and ordered that legal custody be shared between Father and gestational carrier. In addition, the court entered a stipulated order for child support. Father timely appealed the Custody Order. Following the April hearing in the termination matter which had been initiated by gestational carrier, the court entered an order on June 21, 2005 (“Termination Order”), terminating egg donor’s parental rights. Father timely appealed the Termination Order, as did egg donor. The two appeals were assigned to this panel, and we heard oral argument on November 30, 2005.
¶ 21 In his appeal from the Custody Order, docket number 221 WDA 2005, Father raises the following issues for our review:
THE [TRIAL] COURT ERRED IN FINDING THAT A GESTATIONAL SURROGATE IS THE LEGAL MOTHER AND HAS STANDING TO SEEK CUSTODY OF CHILDREN TO WHICH SHE HAS NO GENETIC CONNECTION AND HAD NO INTENTION OF RAISING OR PARENTING[.]
THE [TRIAL] COURT ERRED IN FINDING THAT A GESTATIONAL SURROGATE ESTABLISHED IN LOCO PARENTIS STANDING WHEN THE GESTATIONAL SURROGATE DID NOT ACT IN A PARENTAL ROLE FOR A SUBSTANTIAL AND CONSISTENT PERIOD OF TIME AND SHE PLACED HERSELF IN THAT ROLE IN DEFIANCE OF THE PARENT’S WISHES AND THE PARENT/CHILD RELATIONSHIP^] THE [TRIAL] COURT EXCEEDED ITS PROPER FUNCTION OF DECIDING CONTROVERSIES PRESENTED TO IT BY SUA SPONTE DECIDING THAT A GESTATIONAL SURROGATE WAS THE “LEGAL MOTHER” OF THE TRIPLETS AND SUA SPONTE DECIDING THAT THE SURROGACY CONTRACT WAS VOID[.]
THE [TRIAL] COURT’S FINDINGS THAT THE SURROGACY CONTRACT WAS VOID AND THAT THE GESTATIONAL SURROGATE WAS THE LEGAL MOTHER OF THE CHILDREN IS NULL AND VOID BECAUSE OF THE ABSENCE OF INDISPENSABLE PARTIESU
AFFORDING STANDING TO A GESTATIONAL SURROGATE IN THE ABSENCE OF STATUTORY AUTHORITY AND IN THE ABSENCE OF CLEAR AND CONVINCING EVIDENCE THAT THE CHILDREN ARE NOT RECEIVING PROPER PARENTAL CARE WOULD VIOLATE THE FUNDAMENTAL INTERESTS AND RIGHTS OF A BIOLOGICAL PARENT WITH REGARD TO THE CARE, CUSTODY AND CONTROL OF HIS CHILDREN[.]
THE [TRIAL] COURT ERRED IN FINDING THAT A GESTATIONAL SURROGATE HAS STANDING TO INSTITUTE AND/OR PURSUE A CIVIL ACTION SEEKING CHILD SUPPORT BECAUSE SHE [HAS] CUSTODY OF AND IS CARING FOR THE CHILDREN IN DEFIANCE OF THE NATURAL PARENT’S WISHES AND IN DEFIANCE OF THE PARENT/CHILD RELATIONSHIP^]
THE [TRIAL] COURT ERRED IN FINDING THAT IT WAS IN THE *1272 BEST INTERESTS OF THE CHILDREN THAT CUSTODY BE AWARDED TO A GESTATIONAL SURROGATE, RATHER THAN THE BIOLOGICAL FATHER OF THE CHILDREN!!.]
(Father’s [Custody Matter] Brief at 8).[15]
¶ 22 In his appeal from the Termination Order, at consolidated docket numbers 1256 and 1266 WDA 2005, Father raises the following issues for our review:
1. WHETHER THE [TRIAL] COURT LACKED JURISDICTION TO TERMINATE THE RIGHTS OF [J.R.], WHEN AN ADOPTION OF THE CHILDREN WAS NOT PENDING OR INTENDED AND WHEN THE REQUIREMENTS OF [THE] ADOPTION ACT WERE NOT COMPLIED WITH BY THE PETITIONER, [D.B.]?
2. WHETHER THE [TRIAL] COURT ERRED IN FINDING THAT PETITIONER, [D.B.] HAD STANDING TO SEEK THE TERMINATION OF [J.RJ’S PARENTAL RIGHTS?
3. WHETHER THE [TRIAL] COURT ERRED IN FINDING THAT PETITIONER, [D.B.] ESTABLISHED BY CLEAR AND CONVINCING EVIDENCE THAT THE PARENTAL RIGHTS OF [J.R.] SHOULD BE TERMINATED?
4. WHETHER THE [TRIAL] COURT LACKED COMPETENT EVIDENCE TO TERMINATE THE RIGHTS OF [J.R.]?
5. WHETHER THE [TRIAL] COURT ERRED IN FINDING THAT PETITIONER, [D.B.] ESTABLISHED BY CLEAR AND CONVINCING EVIDENCE THE DEVELOPMENTAL, PHYSICAL AND EMOTIONAL NEEDS AND WELFARE OF THE CHILDREN WOULD BE SERVED BY TERMINATING THE RIGHTS OF THEIR BIOLOGICAL MOTHER, RESPONDENT, [J.R.]?
(Father’s [Termination Matter] Brief at 4).[16]
¶ 23 As we noted above, our resolution of the custody matter necessarily resolves the termination matter. For this reason, we address first the issues Father raises in his brief challenging the Custody Order. For our purposes, Father’s seven claims can be condensed into two distinct issues, the first of which has two parts:
*1273 1) Whether the trial court erred in determining that gestational carrier had standing to challenge the natural father’s custody of the triplets based on
a) her in loco parentis status, and/or
b) her status as the legal mother of the babies; and
2) Whether the trial court erred in granting primary physical custody to gestational carrier.
Because we find that gestational carrier has no standing to pursue custody of the children on either an in loco parentis basis or as the children’s “legal mother”, we do not reach the issue of whether the evidence presented at the custody hearings was sufficient to support the court’s award of primary physical custody to gestational carrier.
STANDING BASED ON IN LOCO PARENTIS STATUS
¶ 24 Regarding the first part of the standing issue, Father contends that gestational carrier does not have in loco par-entis status because she is a non-parent third party who took the children home from the hospital in defiance of his wishes. We agree.
¶ 25 We begin with our standard of review in a custody matter, which standard is “of the broadest type”:
[We are] not bound by the deductions or inferences made by the trial court from its findings of fact, nor must [we] accept a finding that has no competent evidence to support it. However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. Thus, [we are] empowered to determine whether the trial court’s incontrovertible factual findings support its factual conclusions, but [we] may not interfere with those conclusions unless they are unreasonable in view of the trial court’s factual findings[,] and thus, represent a gross abuse of discretion.
T.B. v. L.R.M., 874 A.2d 34, 37 (Pa.Super.2005) (quoting Liebner v. Simcox, 834 A.2d 606, 609 (Pa.Super.2003), appeal denied, - Pa. -, 890 A.2d 1060 (2005)). Because this case involves questions of law, our scope of review is plenary. See Peters v. Costello, — Pa. -, 891 A.2d 705, 710 (2005).
¶ 26 Well-settled Pennsylvania law provides that persons other than a child’s biological or natural parents are “third parties” for purposes of custody disputes. Id. (citing Gradwell v. Strausser, 416 Pa.Super. 118, 610 A.2d 999 (1992)); Liebner, supra at 609 (citation omitted). In addition, natural parents have a prima facie right to custody. McDonel v. Sohn, 762 A.2d 1101, 1105 (Pa.Super.2000). “Except via dependency proceedings, third parties lack standing to seek custody as against the natural parents unless they can demonstrate a prima facie right to custody.” Id. Accord Rosado v. Diaz, 425 Pa.Super. 155, 624 A.2d 193, 195 (1993) (citing Gradwell, supra at 1002). Even when standing to seek custody is conferred upon a third party, the natural parent has a “prima facie right to custody,” which will be forfeited only if clear and “convincing reasons appear that the child’s best interest will be served by an award to the third party. Thus, even before the proceedings start, the evidentiary scale is tipped, and tipped hard to the [biological] parents’ side.” Jones v. Jones, 884 A.2d 915, 917 (Pa.Super.2005) (citation omitted); Gradwell, supra at 1001-02.
[T]here is a stringent test for standing in third-party suits for.. .custody due to *1274 the respect for the traditionally strong right of parents to raise their children as they see fit. The courts generally find standing in third-party visitation and custody cases only where the legislature specifically authorizes the cause of action. A third party has been permitted to maintain an action for custody, however, where that party stands in loco parentis to the child.[17]
The phrase “in loco parentis ” refers to a person who puts oneself in the situation of a lawful parent by assuming the obligations incident to the parental relationship without going through the formality of a legal adoption.... The third party in this type of relationship, however, cannot place himself in loco parentis in defiance of the parents’ wishes and the parent/child relationship.
Liebner, supra at 609 (quoting T.B. v. L.R.M., 567 Pa. 222, 228-29, 786 A.2d 913, 916-17 (2001)). Accord B.A. v. E.E., 559 Pa. 545, 549, 741 A.2d 1227, 1229 (1999) (quoting Gradwell, supra at 1103). This Court has also specifically stated:
[A]n important factor in determining whether a third party has standing is whether the third party lived with the child and the natural parent in a family setting, irrespective of its traditional or nontraditional composition, and developed a relationship with the child as a result of the participation and acquiescence of the natural parent.
Liebner, supra at 610 (emphasis added) (quoting Bupp v. Bupp, 718 A.2d 1278, 1281 (Pa.Super.1998)). Accord S.A. v. C.G.R., 856 A.2d 1248, 1250 (Pa.Super.2004) (quoting Bupp, supra), appeal denied, 583 Pa. 678, 877 A.2d 459 (2005). In other .words, a third party may not intervene and assume in loco parentis status where the natural parent opposes such intervention. B.A., supra. For example, our Supreme Court held in B.A. that prospective adoptive parents could not assume the role of parent for an infant in their custody even where the natural mother had consented, but in defiance of the natural father’s wishes. Notably, the father had tried to gain custody since shortly after the child’s birth. Id. at 550, 741 A.2d at 1229.[18]
¶ 27 In the case sub judice, the trial court relied in part on the holdings in Charles v. Stehlik, 560 Pa. 334, 744 A.2d 1255 (2000) and Cardamone v. Elshoff, 442 Pa.Super. 263, 659 A.2d 575 (1995) in support of its position that “claims of parenthood and parental disagreement are not *1275 enough to defeat standing.” (Trial Court Opinion, filed April 2, 2004, at 22; Trial Court Opinion, filed January 7, 2005, at 26-27).[19] This reliance is misplaced.
¶ 28 In Charles, supra our Supreme Court determined that a stepfather should have primary custody of a child, Matthew, rather than Matthew’s biological father who lived in New Jersey. Matthew had lived with his stepfather and his biological mother in Pennsylvania since the couple had married when Matthew was one year old. Following Matthew’s mother’s death from cancer more than five years later, Matthew’s stepfather filed a complaint seeking primary custody, and Matthew’s biological father contested. Based upon in loco parentis, the Court agreed that the stepfather had standing to seek custody. Evidence revealed, inter alia, that Matthew considered the stepfather his “dad” and that to uproot the child from his “dad”, his home, his school and his friends so soon after his mother’s death could have proven devastating to Matthew’s psychological condition. Id. at 340-41, 744 A.2d at 1258. Following an extensive review of the particular facts of the case, the Court decided that the biological father’s right to custody did not trump the child’s best interests. Id. In addition, the Charles Court noted with favor that the trial court’s custody order provided a gradual increase in visitation with the biological father in New Jersey over several years.
¶ 29 In Cardamone, supra, the natural mother filed a counterclaim for custody of her daughter when the mother’s sister filed a petition to confirm custody after the daughter had lived in maternal aunt’s care for approximately three months. This Court was careful to make a preliminary determination regarding the participation and acquiescence of Mother. It specifically noted that there was “no evidence in the record that Mother was defiant with respect to Daughter living with Maternal Aunt. On the contrary, Mother consensually left Daughter in the care of Maternal Aunt in the Spring of 1992.” 695 A.2d at 581-82. When deciding the issue of standing in these cases, the court must consider how the child came to be in the care of the third party, and whether the parental duties were discharged by the third party with the acquiescence of the natural parent.
¶ 30 The facts now before us are easily distinguishable from Charles, supra, and Cardamom, supra. There was no acquiescence or participation by Father in gestational carrier’s unilateral decision to take custody of the triplets.[20] The requirement of a natural parent’s participation and acquiescence is critical to the determination of whether to accord a third party in loco parentis status. See McDonel v. Sohn, 762 A.2d at 1106 (recognizing that there can be no in loco parentis status for a third party if the natural parent’s actions conflict with such a finding). The law simply cannot permit a third party to act contrary to the natural parent’s wishes in obtaining custody and *1276 then benefit from that defiant conduct in a subsequent custody action. Here, the manner in which gestational carrier obtained custody of the children was fraught with impropriety, a fact completely overlooked by the trial court.
¶ 31 There is no dispute that intended parents came to visit the triplets the day they were born, despite gestational carrier’s failure to inform them of the date which she had scheduled for the C-section. It is also undisputed that the premature infants were out of necessity under the care of trained medical professionals in the NICU for the next several days. The record is replete with chart notations and testimony concerning numerous telephone calls placed by E.D. checking on the health, status, and welfare of the triplets. Gestational carrier was discharged from Hamot on Saturday, November 22, 2003, knowing full well that intended parents were taking the necessary steps to bring the triplets home and knowing full well that E.D. was planning to adopt them. The neonatal physicians had communicated to intended parents that the triplets required medical attention and would not be ready for discharge from the NICU until Thursday or Friday, November 27th or 28th at the earliest. Nesting with the triplets had to be postponed not once, but twice, through no fault of intended parents. In fact, as intended parents were preparing to leave for Hamot on Sunday, November 23, 2003, they received a call from Dr. Jonathan Chai, who told them they could not nest that day, nor would they be able to receive mandatory monitor training that day.
¶ 32 Gestational carrier herself did not return to Hamot until Tuesday, November 25th. On that date, she unilaterally decided that Father and E.D. would not be “fit parents.” Based on her personal judgment, gestational carrier arranged to nest with the triplets in advance of taking them home with her. Gestational carrier made these arrangements without the consent of Father, with full knowledge that she did not have his consent, and on the very day she knew intended parents were coming to Hamot. When intended parents arrived for their scheduled nesting and monitor training, they were turned away by hospital staff, who misled them by claiming that the babies had been “discharged” to gestational carrier, when in fact the triplets were still in the hospital, and gestational carrier was preparing to nest with them in intended parents’ stead. Two days later, after she nested and received training, gestational carrier took the triplets to her home, again, in direct defiance of Father’s wishes. E.D. left telephone messages for gestational carrier seeking to locate the triplets, and Father immediately took steps to gain custody of his children.
¶ 33 Clearly, the facts of this case show unequivocally that Father at no time participated or acquiesced in gestational carrier’s assuming custody of the triplets. Indeed, the very manner in which gestational carrier managed to secure custody establishes the complete lack of Father’s participation and the knowledge that her actions were in defiance of Father’s wishes. Hospital personnel lied to Father by telling him that the babies had been “discharged” to gestational carrier when, in fact, they were in the hospital at that moment and remained there for two more days. Our case law is very clear that there can be no finding of in loco parentis status where the third party obtains her status in defiance of the natural parent’s wishes. See B.A., supra; Gradwell, supra. Accordingly, gestational carrier’s standing to pursue *1277 custody of the babies cannot be sustained on the basis of in loco parentis status and the trial court erred in ruling otherwise.[21]
STANDING BASED ON “LEGAL MOTHER” STATUS
¶ 34 Father also asserts that the trial judge erred in granting gestational carrier standing on an alternate basis, namely, her status as “legal mother”. Specifically, Father challenges the trial court’s authority to void the Surrogacy Contract sua sponte and name gestational carrier as the “legal mother” of the babies without notice to the biological mother or the intended mother. We agree that these findings cannot be sustained and rely on multiple reasons why the court’s actions do not withstand scrutiny.
¶ 35 First, it is clear from the pleadings in this case that neither Father nor gestational carrier sought invalidation of the Contract. The law of this Commonwealth provides that courts may not rule on matters not before them:
Due process requires that the litigants receive notice of the issues before the court and an opportunity to present their case in relation to those issues. It is even more egregious an error when the lack of notice, through variance from the pleadings, is the court’s doing. For when the issue is first stated only in the court’s resolution of it, the unsuspecting party has no opportunity during the proceedings to voice his objections or match his case to the altered issue.
Fallaro v. Yeager, 364 Pa.Super. 408, 528 A.2d 222, 224 (1987) (quoting In Interest of M.B., 356 Pa.Super. 257, 514 A.2d 599, 600-601). See also In the Matter of A.L., 779 A.2d 1172 (Pa.Super.2001) (holding trial court lacked jurisdiction to raise the issue of dependency sua sponte, where the issue of dependency was not properly before the court).
¶ 36 In support of its decision to address the validity of the Surrogacy Contract directly, the court relied on Walker v. Walker, 308 Pa.Super. 280, 454 A.2d 130, 132 (1982), for the proposition that “a contract pertaining to the custody of a minor child is always subject to being set aside in the best interest of the child.” (Trial Court Opinion, filed January 7, 2005, at 23-24). While the axiom is well settled, see Miller v. Miller, 423 Pa.Super. 162, 620 A.2d 1161 (1993), its application here is misplaced. In both Walker, supra, and Miller, supra, the parties (natural parents) had executed a separation agreement which included provisions for child custody and support of their children. Standing was not an issue. On review, this Court applied the “best interests” standard. This standard presupposes that the parties have the requisite standing to challenge custody before the court and to argue what is in the best interests of the children involved. Critically, in both of these cases, all interested and indispensable persons were parties to the proceedings.
¶ 37 In addition to assessing the validity of the Contract without a request that it do so, the trial court herein proceeded to declare the Contract void despite the absence of some of the parties *1278 to the Contract. See 28 Pa.C.S.A. § 5425 (setting forth the Domestic Relations Code requirements for notice, opportunity to be heard, joinder and intervention). The court compounded its error by naming gestational carrier the “legal mother” without even notifying egg donor, the person all parties concede is the biological mother of the babies. Plainly, egg donor was an indispensable party in this action. Thus, not only was it necessary to notify egg donor because she was a party to the Contract, it was also imperative that she have notice because she is the biological mother of the triplets. In light of these facts, the court lacked jurisdiction to rule on the issue of who was the “legal mother.”[22] See In re A.L., supra; Fallaro, supra. See also Hubert v. Greenwald, 743 A.2d 977 (Pa.Super.1999) (holding court has no jurisdiction to proceed in absence of indispensable party); Hart v. O’Malley, 436 Pa.Super. 151, 647 A.2d 542 (1994) (same).
¶ 38 Even if we were to ignore the fact that the court sua sponte addressed the validity of the Contract without a request from the parties and without all indispensable parties present, we would conclude that the court’s analysis of the issue was seriously flawed. The trial court utilized the terms of the Contract and restricted certain parties’ rights based on those terms while it simultaneously deemed the Contract void. For example, in determining that gestational carrier was the “legal mother” of the triplets, the trial court treated egg donor as an anonymous biological donor who had signed her rights away by contract much like an anonymous sperm donor. (Trial Court Opinion, filed April 2, 2004, at 2 n. 4). Of course, if the *1279 entire Surrogacy Contract is void, egg donor could not have “signed away her rights by contract.”[23]
¶ 39 Further, the trial court simply does not offer sufficient support or a reasoned basis for its decision to void the Surrogacy Contract and name gestational carrier the “legal mother” of the babies. “Generally, a clear and unambiguous contract provision must be given its plain meaning unless to do so would be contrary to a clearly expressed public policy [and we are mindful that] public policy is more than a vague goal which may be used to circumvent the plain meaning of the contract.” Eichelman v. Nationwide Ins. Co., 551 Pa. 558, 563, 711 A.2d 1006, 1008 (1998) (citations omitted). Accord Estate of DeMutis v. Erie Insurance Exchange, 851 A.2d 172, 174 (Pa.Super.2004) (citation omitted). To be contrary to public policy, a contract must tend to injure the public or be against the public good, or must be inconsistent with good morals as to the consideration to be exchanged or the thing to be done for consideration. In re Book’s Estate, 297 Pa. 543, 147 A. 608 (1929). Only in the clearest of cases may a court declare a contract void as against public policy. Eichelman, supra.
¶ 40 The trial court herein struck down the Contract primarily because the parties failed to name a legal mother. However, the designation of who is a “legal mother” is one ultimately determined by statute and/or judicial ruling. Had the parties named a legal mother in the Contract, that designation surely would not have been binding on the court. We find the trial court’s basis for invalidating the Contract unsupportable.[24]
¶ 41 The issues this case presents are important and warrant the most careful deliberation. We recognize that our obligations and authority as members of the judicial branch are limited and must be exercised and fulfilled in conjunction with the powers of the legislative branch. Our legislature is currently considering its position with respect to the type of contract at issue here.
¶ 42 Despite the lack of applicable law, the trial court determined, sua sponte, that it would strike the Surrogacy Contract completely and name gestational carrier *1280 the triplets’ “legal mother”. The court, invoking public policy, found that gestational carrier “assumed” maternity; the court characterized her as “more a mother and a parent by her actions than by genetics.” (Trial Court Opinion, dated April 2, 2004, at 18). The court did not cite any law in support of its finding; it merely concluded that this was the case. Our assessment of how gestational carrier came to have custody of the triplets is outlined above; we need not repeat it here. In essence, the trial court voided the Contract so that it could change the status of the parties, by naming gestational carrier “legal mother.” This in turn gave gestational carrier standing to seek custody, despite the conduct in which gestational carrier had engaged. We flatly reject this reasoning and this result.[25]
¶ 43 This case involves a biological father seeking custody of his children from a third party gestational carrier who is not the children’s biological mother, and who took the children from the hospital in direct defiance of Father’s wishes after she completely changed her mind about how matters would proceed.[26] There is no law in this Commonwealth that accords standing to a surrogate with no biological connection to the child she seeks to take into her custody. Today, on these facts, we decline to grant such a party standing.
¶ 44 In addition, we decline to rule on the validity of the Surrogacy Contract at issue here. We find such a ruling unnecessary in light of the status of the parties, as well as the fact the neither party requested judicial assessment of the Contract. We also decline to rule on the propriety of surrogacy contracts generally. That is a task for our legislators.
¶ 45 In summary, we hold that, with regard to the custody matter, Father was entitled to obtain custody of his biological children from the third party gestational carrier who has no biological connection to the children and who took custody of the children in flagrant defiance of Father’s wishes. The trial court erred in finding that gestational carrier had in loco paren-tis status to challenge Father’s right to custody. Gestational carrier’s defiant conduct precluded such a finding. Moreover, the trial court erred in sua sponte voiding the Surrogacy Contract as contrary to public policy and in naming gestational carrier as the “legal mother”. None of the bases upon which the trial court relied for standing can be sustained.
¶ 46 Our holding in the custody matter undeniably controls the outcome of the termination case. The law is clear that a party, other than an agency or attorney representing a child, may bring an action for involuntary termination of a parent’s rights only if she is 1) the other parent or 2) an individual with in loco parentis sta *1281 tus who has filed a report of intention to adopt. 23 Pa.C.S.A. § 2512(a)(1) & (3). In order to sustain gestational carrier’s right to bring the termination action, the trial court of necessity relied on its prior finding that gestational carrier was the legal mother of the children.
¶ 47 In her brief, gestational carrier concedes (and rightly so) that in the absence of the trial court’s order that deemed her the triplets’ “legal mother,” she has no standing to bring the termination action against egg donor. (Gestational Carrier’s [Termination Matter] Brief at 16). We have vacated the trial court’s finding that gestational carrier is the legal mother here. We have also vacated the court’s finding that gestational carrier had in loco parentis status. As a result, there is no need to assess the merits of the trial court’s termination decision, as the matter itself should not have proceeded to a hearing due to gestational carrier’s lack of standing to bring the action.
CONCLUSION
¶ 48 We cannot conclude this matter without recognizing the profound effect its resolution will have on the three persons who matter most in this case: Father’s biological children. We reach our resolution here only after lengthy, serious reflection and concern. Due in part to troubling conduct on the part of gestational carrier and Hamot personnel, and due also to the length of time it takes for matters to wend their way through our legal system, we have before us three small boys who no doubt face a challenging period of transition and change. In light of this, we urge the parties to act hereinafter with the utmost respect for the boys’ right of privacy. Furthermore, we strongly recommend that the transfer of custody and the preparations therefor be conducted privately, in the presence of the parties and their immediate families only. Although it is likely unnecessary, we encourage all parties to put aside their personal positions in this case and instead place the emotional welfare of these children above all other concerns in the days ahead.
¶ 49 The order of the trial court awarding primary physical custody, as well as child support, to gestational carrier, with partial custody rights to Father, is hereby vacated and we direct that Father be awarded full physical and legal custody of his biological children. Further, the trial court’s order terminating egg donor’s parental rights is reversed. Jurisdiction is relinquished.

. We have consolidated these custody and termination matters because, as explained infra, our resolution of the former controls the outcome of the latter.

. E.D. has received a yearly pension since 1973, which she would lose should she remarry. (Notes of Testimony ("N.T.”) Standing Hearing, 1/29/04, at 7; R.R. at 133a). However, the couple has always been willing to give up the pension and marry, if necessary, to obtain custody of the triplets. {Id.).

.E.D.’s daughter and her family live within walking distance of the couple’s home in Ohio, and E.D. frequently baby-sits for her grandchildren.

. Amy Hokaj is a licensed, independent social worker and “adoption assessor” for Adoption Circle, a state licensed agency in Ohio. Ms. Hokaj was assigned to work on the adoption matter which had been initiated by E.D. in Ohio sometime in early 2004.

. A single-birth normal pregnancy typically lasts approximately forty (40) weeks.

. In good weather, the trip from Ohio to Erie, Pennsylvania, takes approximately three hours round trip. (N.T. Standing Hearing, 12/22/03, at 35; R.R. at 106a).

. During these calls, gestational carrier purportedly expressed concern that the couple was not coming to the hospital frequently to visit the triplets. E.D. explained that her daughter was away for the week and E.D.’s four young grandchildren were staying with them, and it was difficult to travel from their home to Erie to visit the triplets in the NICU with four young children. (N.T., supra). Because gestational carrier had unilaterally scheduled the C-section for November 19th and had deliberately chosen not to inform intended parents, E.D. did not have any opportunity to make other plans for the care of her grandchildren.

. (See, e.g., Dr. Jonathan Chai D.T., 2/24/04, at 12; Dr. Michble Chai D.T., 3/9/04, at 10, 27, 32; Deposition Exhibit "Hospital Record/Nursing Notes”).

. Although the record does not reveal exactly when E.D. started the adoption process in Ohio, certain financial and medical forms dated January 5, 2004, indicate the process had already begun. (Hokaj Deposition Exhibit A; R.R. at 1027a, 1031a). Ms. Hokaj conducted home study visits on January 17 and 22, 2004. On February 23, 2004, Ms. Hokaj and her supervisor at Adoption Circle signed an Ohio Department of Human Services Assessment for Child Placement recommending that E.D. be approved as a prospective adoptive parent of the Caucasian, male triplets. (Id.; R.R. at 1020a). ' E.D. testified on January 29, 2004, that the couple had paid an attorney in August 2003 to begin making arrangements for the adoption. (N.T. Standing Hearing, 1/29/04, at 16; R.R. at 142a).

. "Nesting” at Hamot occurs when new parents stay at the hospital overnight with their newborn and use the apnea monitor or any other equipment as they would at home, while hospital staff is nearby to assist if necessary.

. Dr. Michele Chai spoke with E.D. on Monday, November 24th and informed her that she anticipated the triplets would be ready for discharge in another two or three days. (Dr. Michele Chai D.T. at 10, 30).

. The trial court noted that gestational carrier's mother worked at Hamot, stopped by to check on the babies, and provided updates to gestational carrier.

. According to Hamot witnesses, no staff member had expressed a concern to intended parents about physical visits. (See Dr. Jonathan Chai D.T. at 36; N.T. Standing Hearing, 1/29/04, at 101, 115, 118, 134, 140; R.R. at 227a, 241a, 244a, 260a, 266a). In fact, Dr. Jonathan Chai testified, "Not visiting in and of itself is not all that uncommon. There are a lot of reasons that parents don’t come to visit their babies in the NICU. And certainly for parents that are out of town, you know, we understand that some have transportation issues, some have other children that they need to take care of. So, that in and of itself is not that unusual.” (Dr. Jonathan Chai D.T. at 25).

.Had he known that the children were still in the hospital, Father would have retained an attorney and attempted to obtain a restraining order to keep gestational carrier from taking *1270 the newborn children home with her. (N.T. Standing. Hearing, 12/22/03, at 24; R.R. at 95a).

. Father has also .filed a motion to strike gestational carrier’s appellate brief, based upon her failure to cite to the record in support of her factual allegations and failure to cite a single case in support of her legal position, pursuant to the Rules of Appellate Procedure and the case law interpreting them. See Pa.R.A.P. 2101, 2117, 2119; Commonwealth v. Miller, 721 A.2d 1121, 1124 (Pa.Super.1998). While gestational carrier’s brief is certainly deficient in citations to the record, we deny the motion as moot; gestational carrier has already had the benefit of oral argument.

. Egg donor also filed an appeal from the trial court’s termination order. In her brief, she asserts that gestational carrier’s termination petition was filed prematurely. We do not address this issue, as we resolve the entire matter in favor of Father and egg donor based on gestational carrier's lack of standing to bring the termination action. We note also that the trial court named counsel to represent the children's interests in these matters. On appeal, counsel for the children has adopted the position of the trial court and has attached a copy of the court’s opinion in lieu of a brief.

. In Rosado, supra the trial court dismissed a third party’s complaint for custody of a child she had raised for the previous five years because the natural mother also sought custody. The court refused to accept testimony from the third party about her relationship with the child and the child’s natural father, citing the natural mother's "prima facie right to custody”. Id. at 194. This Court vacated and remanded for a full hearing on the issue of whether the third party could establish in loco parentis status and, as a result, would have standing to seek custody.

. In T.B., supra, our Supreme Court declined to apply its holding in B.A., supra where the natural mother in T.B. was contesting the standing of her former lesbian partner to bring an action for visitation because the couple had previously lived as a family unit and the former partner had acted as a co-parent with the natural mother. The Court specifically concluded that it w.as not a case where the third party had assumed the parental status against the wishes of the biological mother, but rather that the biological mother had in fact consented to and encouraged the third party to assume the status of parent. Id. at 232, 786 A.2dat919.

. 70 Pa.D. & C.4th 261 (Erie Cty.2005).

. In addition, other cases the trial court cites involve third parties who had the participation and acquiescence of the natural parent as a prerequisite to obtaining in loco parentis status. Likewise, those cases are also inapplicable. The trial court appears to have blurred the concepts of standing to seek custody and a claim seeking custody. (See Trial Court Opinion, Sled April 2, 2004, at 22). One must have standing before he or she can intervene in a custody action, wherein the best interests standard is applied. As the trial court noted, there is currently no legislation conferring standing on a gestational carrier.

. The facts that establish gestational carrier acted in direct defiance of Father’s wishes likewise put to rest any assertions by gestational carrier, her counsel, or the media that Father and E.D. "abandoned” the babies. AI-legations that gestational carrier took custody of the children to prevent what has been characterized as imminent placement into foster care are completely unfounded and find no support in the record.

. We note that after the trial court's April 2004 order deeming gestational carrier the legal mother of the triplets and granting her standing to pursue custody, egg donor filed an action in Ohio seeking a declaration that she and the triplets had a parenl/child relationship. The Ohio court, in an order dated October 29, 2004, granted egg donor relief and specifically found that it was not precluded from ruling on the matter as a direct result of the Pennsylvania court’s failure to notify egg donor, the genetic parent, of the proceedings and failure to provide her with an opportunity to be heard. Despite finding that the evidence did establish a parenl/child relationship between egg donor and the babies, the Ohio court refused to make further findings regarding the parenting relationships between gestational carrier and the triplets. The Ohio court held that it had no jurisdiction to make such a ruling because the issue was still before the Pennsylvania courts, which is the children's home state and which has exclusive jurisdiction over parenting determinations with respect to them. J.R. v. J.F. and D.B., 9th Dist. No. 22416, 2005-Ohio-4667, 2005 WL 2140576. The Ohio judgment and findings and conclusions in support thereof were attached to gestational carrier’s Amended Petition for Involuntary Termination of Alleged Parental Rights and are part of the reproduced record in the termination case. (R.R. [Termination Matter] at 12a-17a).
Recently, the Ohio appellate court issued an opinion in favor of Father's claims against gestational carrier, which claims had been filed by Father in that state. See J.F. v. D.B., et al, 9th Dist. No. 22709, 2006-Ohio-1175[, 2006 WL 630009]. The Ohio court held that the parties' surrogacy contract was enforceable under Ohio law, and, further, that gestational carrier was liable to Father for reimbursement of the contract fee, as well as money paid for support. Id. at ¶ 22. Father has filed a petition in the instant matter, seeking permission to submit a brief discussing the import of the Ohio decision. We deny Father’s petition. The Ohio court’s analysis and reasoning regarding the validity of surrogacy contracts in that state are not relevant to the issues under consideration here. Our decision today is limited to ’ determining the question of standing under the unique facts of this case. We offer no comment on the validity of surrogacy contracts in this state or any other. As a result, the Ohio case has no bearing on our decision.

. The court's reasoning was not only circuitous, it was inconsistent. Although it considered and held Contract terms against egg donor, it did not extend the same reasoning to gestational carrier, who made some of the same promises with respect to waiver as egg donor had made. (See Contract, Complaint for Sole Custody, Exhibit B; R.R. at 28a-39a).

. Because of the resolution of standing, we decline to address the merits of any other issue in the trial court opinion. We are aware that the trial court voided the Surrogacy Contract on another ground, to wit, because it found that the terms of the contract allowed the parties to "bargain away” the children’s rights in violation of long-standing public policy in this Commonwealth. See Sams v. Sams, 808 A.2d 206, 211 (Pa.Super.2002) (finding that ex-spouse’s agreement, which called for a reduction in child support, was unconscionable and would not be enforced). We do not review this ruling by the trial court because we believe review is unnecessary. Sams, and the other cases like it on which the trial court relies, did not involve a standing issue. Here, it was not the court’s voiding of the Contract that gave gestational carrier standing; rather, it was the court’s subsequent naming of gestational carrier as legal mother that afforded her standing. As we explained supra, the court’s determination that gestational carrier is the “legal mother” cannot be sustained because, inter alia, there was no notice to the biological mother nor was there ah opportunity for her to be heard.

. We recognize that in the absence of statutory guidance, we too could rely on public policy and conclude that gestational carrier should be granted standing simply because she carried the children to birth. See Reinforced Earth Company v. Workers’ Compensation Appeal Board, 570 Pa. 464, 474, 810 A.2d 99, 105 (2002) (noting that in the absence of legislation, courts have independent authority to discern public policy). After careful analysis and thorough consideration of the particular facts and unique circumstances of this case, we expressly decline to do so.

. Despite our clear disapproval of the manner in which events proceeded to allow gestational carrier to take custody of the triplets, we make no comment on gestational carrier’s motives here. Gestational carrier may have had the very best intentions when she decided to take the children home. We have no reason to doubt the sincerity of her judgments and beliefs. However, those judgments simply were not hers to make.