J-A01001-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| JAMES R. WILLIAMS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CHELSEA WILLIAMS | : | |
| | : | |
| | : | No. 1182 MDA 2021 |
| APPEAL OF: JAMES AND CHARLENE | : | |
| WILLIAMS, | : | |
| | : | |
| Intervenors | : | |

Appeal from the Order Entered August 6, 2021
In the Court of Common Pleas of York County Civil Division at No(s):
2013-FC-001306-03

BEFORE:  LAZARUS, J., NICHOLS, J., and KING, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED MARCH 09, 2022**

James and Charlene Williams (collectively, Grandparents)[1] appeal from the order, entered in the Court of Common Pleas of York County, denying their petition seeking to intervene and grant them standing to seek partial custody of their grandson, J.R.W.  After careful review, we affirm.

The facts do not seem to be in great dispute.  J.W. (Father) and C.W. (Mother) (collectively, Parents) married in May 2011.  In June 2011, J.R.W. was born.  At the time of J.R.W.'s birth, while Parents waited for their home

---

[1] Grandparents are J.R.W.'s paternal grandparents.

to be move-in-ready, Parents and Child resided with Grandparents for one month.

Parents separated in October 2012 and, ultimately, divorced in 2013. From June 2013 through September 2016, J.R.W. lived with Grandparents "on a full[-]time basis." N.T. Standing Hearing, 4/23/21, at 18. On July 19, 2013, Father filed a custody complaint against Mother. On August 26, 2013, the court entered an interim custody order, pending trial, granting Parents joint legal and shared physical custody. On March 4, 2016, Mother filed a petition to modify custody,[2] seeking primary physical custody of J.R.W. after she decided to relocate to Maryland. On April 12, 2016, the court entered another interim custody order awarding Parents shared legal and physical custody of J.R.W. on a two-week rotation.

Following a custody trial held on September 6, 2016, the Honorable Kathleen J. Pendergast entered a final order awarding Parents joint legal custody, Father primary physical custody, and Mother partial physical custody. At trial Mother "raised concerns that Father was relying heavily on [G]randparents to help him in his duties." Trial Court Custody Opinion, 9/12/16, at 6. As a result of Mother's concern, the trial court specifically questioned Father about his involvement in J.R.W.'s life, particularly Father's

_____

[2] Parents allegedly disagreed on where J.R.W. "would attend school and necessary modifications based upon J.R.W.'s school schedule." Father's and Mother's Joint Memorandum of Law, 7/30/21, at 2.

decisions regarding J.R.W.'s doctor and dentist appointments and Father's attendance at J.R.W.'s preschool activities. **See id.** In deciding to award Father primary physical custody, the trial judge concluded that Father has clearly been involved in medical decisions for J.R.W. and that Father "took the initiative in arranging" for J.R.W. to attend preschool and other activities. **Id.** The trial court ultimately found that "[b]oth parents seem to be accepting their primary responsibilities for meeting the needs of [J.R.W.] with appropriate assistance from family." **Id.** The court also found that J.R.W. "has always lived at the marital residence," that the house is in Father's name only, and that "stability in [J.R.W.'s] education is more likely [if J.R.W. were to live] at . . . Father's [residence.]" **Id.** at 7. Finally, the court determined that Grandmother, who does not work outside of the home, "has been the stable daycare resource for both Father and Mother." **Id.** at 12.

Since resolution of the custody matter, Parents' relationship with Grandparents has declined. On April 1, 2021, Grandparents initiated the instant custody action, seeking partial physical custody of J.R.W., by filing a petition for standing and a request to intervene based on the *in loco parentis*

doctrine, **see** 23 Pa.C.S.A. § 5324(2),[3] as well as pursuant to section 5325(2)[4]

of the Child Custody Act (Act).[5]  Parents filed preliminary objections to

Grandparents' petition, as well as a joint brief opposing granting

Grandparents' standing[6] and permission to intervene.  The court held hearings

---

[3] Pursuant to section 5324(2), "[a] person who stands *in loco parentis* to the child . . . may file an action for any form of physical custody or legal custody." 23 Pa.C.S.A. § 5324(2) (italics added).

[4] Pursuant to section 5325(2), grandparents and great-grandparents may file an action for partial physical or supervised physical custody

\* \* \*

> (2) where the relationship with the child began either with the consent of a parent of the child or under a court order and where the parents of the child:
>
> (i) have commenced a proceeding for custody; and
>
> (ii) do not agree as to whether the grandparents or great grandparents should have custody under this section[.]

23 Pa.C.S.A. § 5325(2).

[5] **See** 23 Pa.C.S.A. § 5321, *et seq*.

[6] In **D.P. v. G J.P.**, 146 A.3d 204 (Pa. 2016), our Supreme Court stated:

> It is notable that the redrafted 23 Pa.C.S.[A.] ch. 53, more expressly than its predecessor, segregates grandparent standing requirements (23 Pa.C.S.[A.] § 5325) from merits considerations (23 Pa.C.S.[A.] § 5328).  Therefore, as illustrated presently, whenever there are contested issues relating to standing, the chapter gives parents the ability to bifurcate the proceedings by seeking dismissal for lack of standing, thereby requiring that any such preliminary questions be resolved before the complaint's merits are reached.  The potential for such bifurcation serves an important screening function in terms of protecting parental

*(Footnote Continued Next Page)*

on April 23, 2021 and August 2, 2021. On August 6, 2021, the trial court dismissed Grandparents' petition, heavily relying on the following reasons established at the 2016 custody trial:

>    (1) At the time of the custody hearing in 2016, Parents were found to accept their primary responsibilities for meeting the needs of J.R.W. with appropriate assistance from extended family ("Father was primarily doing the duties when [J.R.W.] was with him and Mother was primarily meeting her duties when [J.R.W.] was with her");
>
>    (2) Grandmother testified that, at most, J.R.W. spent time overnight at her house two nights per week when [F]ather was working long shifts as a firefighter with emergency services;
>
>    (3) Grandparents have not had legal custody of J.R.W. or provided anything other than daycare to him during the recent years (since 2016);
>
>    (4) Grandparents have never had standing throughout the entirety of the underlying custody matter between Parents, nor have they been a party to such proceeding;
>
>    (5) Parents object to Grandparents obtaining standing; and
>
>    (6) Due to Parents' objection to standing, if the court were to grant Grandparents standing[,] it "would be contrary to the constitutional rights of the parents as well as current case law."

Order, 8/6/21, at 2-4.

---

rights. As suggested, it facilitates early dismissal of complaints, thereby relieving families of the burden of litigating their merits where a sufficient basis for standing is absent.

*Id.* at 213.

Grandparents filed a timely notice of appeal from the court's order, as well as a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Grandparents present the following issues for our review:

(1) Did the trial court err as a matter of law in conflating standing for grandparents pursuant to the *in loco parentis* doctrine and standing pursuant to 23 Pa.C.S. § 5325?

(2) Did the trial court err as a matter of law in dismissing grandparents' petition for partial custody based on a lack of standing?

(3) Did the trial court err as a matter of law in denying grandparents' standing pursuant to the recently decided case of *E.A., III v. E.C.*, [259 A.3d 497 (Pa. Super. 2021)]?

(4) Did the trial court err as a matter of law in denying grandparents' standing pursuant to the *in loco parentis* doctrine by determining that their claim for standing was "stale[?]"

Grandparents' Brief, at 6.

Threshold issues of standing are questions of law; thus, our standard of review is *de novo* and our scope of review is plenary. *K.W. v. S.L.*, 157 A.3d 498, 504 (Pa. Super. 2017). The concept of standing is vital in ensuring that cases are presented to the court by an individual who has a genuine, and not merely a theoretical, interest in the matter. Thus, "the traditional test for standing is that the proponent of the action must have a direct, substantial and immediate interest in the matter at hand." *D.G. v. D.B.*, 91 A.3d 706, 708 (Pa. Super. 2014); *see also Ken R. v. Arthur Z.*, 682 A.2d 1267, 1270 (Pa. 1996) (determination of standing simply implies party has substantial

interest in subject matter of litigation and interest is direct and immediate, and not remote consequence). In *M.W. v. S.T.*, 196 A.3d 1065 (Pa. Super. 2018), our Court emphasized:

> In the area of child custody, principles of standing have been applied with particular scrupulousness because they serve a dual purpose: not only to protect the interest of the court system by assuring that actions are litigated by appropriate parties, but also to prevent intrusion into the protected domain of the family by those who are merely strangers, however well-meaning.

*Id.* at 1069 (citation omitted).

"Generally, the Child Custody Act does not permit third parties to seek custody of a child contrary to the wishes of that child's parents. The Act provides several exceptions to this rule, which apply primarily to grandparents and great-grandparents." *Id.*, citing *K.W.*, 157 A.3d at 504. "[Traditionally, unless] a person seeking custody [wa]s a parent, grandparent, or great-grandparent of the child, the Act allow[ed] for standing only if that "person [] st[ood] *in loco parentis* to the child." *K.W.*, *supra* at 504, citing 23 Pa.C.S.A. § 5324(2). *See also* 23 Pa.C.S.A. § 5324(3); *Id.* at §§ 5325(1-3).[7]

---

[7] In 2018, section 5324 was amended to add that an individual—other than a parent, grandparent, or great-grandparent—may file an action for any form of physical or legal custody, where that person "establishes by clear and convincing evidence all of the following: (i) The individual has assumed or is willing to assume responsibility for the child[;] (ii) The individual has a sustained, substantial and sincere interest in the welfare of the child. In determining whether the individual meets the requirements of this subparagraph, the court may consider, among other factors, the nature, quality, extent and length of the involvement by the individual in the child's life[; and] (iii) Neither parent has any form of care and control of the child." *See* 23 Pa.C.S.A. § 5324(4) (i-iii). This amendment, however, is inapplicable to facts of this case.

Each of Grandparents' issues on appeal concerns the trial court's determination that they do not stand *in loco parentis* to Child and, thus, do not have standing to seek partial custody of J.W.R. Essentially, Grandparents argue that **E.A.** "has no applicability to the instant proceedings" where the facts of **E.A.** are not only strikingly different than those in the instant case, but where **E.A.** also "did not purport to rule on a question of standing involving *in loco parentis* or a grandparent litigant's standing pursuant to [section] 5324." Grandparents' Brief, at 29. Finally, Grandparents claim that the trial court "misapplied the 'timeliness' doctrine enunciated in . . . **E.A.**[,] which was limited to a question as to whether a grandparent had standing pursuant to [section] 5325 [and] should be evaluated and 'determined based upon the facts when the issue is decided.'" **Id.** at 12, quoting **E.A.**, 259 A.3d at 502, citing **M.W.**, **supra** at 1071.

The common law "phrase '*in loco parentis*' refers to a person who puts oneself in the situation of a lawful parent by assuming the obligations incident to the parental relationship without going through the formality of a legal adoption." **C.G. v. J.H.**, 193 A.3d 891, 907 (Pa. 2018) (citation omitted). "The status of '*in loco parentis*' embodies two ideas: first, the assumption of a parental status, and second, the discharge of parental duties." **T.B. v. L.R.M.**, 786 A.2d 913, 917 (Pa. 2001) (citation omitted). "The third party in this type of relationship, however, can[]not place himself *in loco parentis* in defiance of the parents' wishes and the parent/child relationship." **Id.** "[*I*]*n loco parentis* status cannot be achieved without the consent and knowledge

of, and in disregard of[,] the wishes of a parent." ***E.W. v. T.S.***, 916 A.2d 1197, 1205 (Pa. 2007) (citation omitted). Moreover,

> [t]he *in loco parentis* basis for standing recognizes that the need to guard the family from intrusions by third[-]parties and to protect the rights of the natural parent must be tempered by the paramount need to protect the child's best interest. Thus, while it is presumed that a child's best interest is served by maintaining the family's privacy and autonomy, that presumption must give way where the child has established strong psychological bonds with a person who, although not a biological parent, has lived with the child and provided care, nurture, and affection, assuming in the child's eye a stature like that of a parent. Where such a relationship is shown, our courts recognize that the child's best interest requires that the third[-]party be granted standing so as to have the opportunity to litigate fully the issue of whether that relationship should be maintained even over a natural parent's objections.

*Id.* at 917 (quoting ***J.A.L. v. E.P.H.***, 682 A.2d 1314, 1319-20 (Pa. Super. 1996)).

Instantly, Grandparents claim that they "presented unrebutted testimony of their assumption of parental status and discharge of parental duties when [J.R.W.] resided with them during his formative years from 2013-2016." Grandparents' Brief, at 13. Grandparents acknowledge that after Parents' custody trial in 2016, Grandparents "continued to [perform] ongoing weekly responsibilities for [J.R.W.] while father would work consecutive days as a firefighter," Grandparents' Brief, at 13, but it was not until "the relationship between [F]ather and [Grandparents] abruptly turned adversarial in the latter part of 2020" that Grandparents felt "compel[ed] . . . to initiate the instant litigation." *Id.*

The evidence of record shows that J.R.W. and Parents lived with Grandparents for the first few weeks after J.R.W. was born. During that time, Grandparents watched Child "three nights per week," *id.* at 18, and they provided childcare at Parents' request. *See* N.T. Standing Hearing, 4/23/21, at 16 (Grandmother testifying during the first year of J.R.W.'s life, "whenever [Parents] were working, [she] would get [J.R.W.] overnight . . . at least three nights a week."). Moreover, Grandmother had J.R.W. overnight approximately four times per week after Parents separated. *Id.* at 17 (Grandmother testifying that post-separation, J.R.W. would stay overnight at her house approximately four times a week from October 2012 through June 2013). In addition, Grandparents cared for J.R.W., after Father moved in with Stepmother in the fall of 2016. *Id.* at 25 (Grandmother testifying after J.R.W. moved in with Father and Stepmother[8] in fall of 2016 and until December 31, 2019, Grandmother "had [J.R.W.]" when Father and Stepmother were working).

Notably, from June 2013 through September 2016, J.R.W. lived with Grandparents "on a full[-]time basis." *Id.* at 18. At that time, Father resided in and maintained the marital residence; Father took classes in Prince George's County, Maryland, and Mother took classes in Virginia. *Id.* at 18-19. Father and Mother would visit and play with J.R.W. at Grandparents'

_____

[8] Father remarried in 2019 and he and Stepmother have a child together, who lives with them and J.R.W.

house, *id.* at 19, and "once in a[]while" Mother would "keep [J.R.W.] overnight." *Id.* Grandmother testified that during those three years she "played with" J.R.W., "taught him [his] ABC's, read together[,] watched movies together[,] bought everything [J.R.W.] needed [like] his clothes, his shoes, diapers, baby food[, and] formula[,] took him to and paid for preschool[,] accompanied Father to J.R.W.'s medical appointments[, and] fixed him [all of his meals daily]." *Id.* at 19-23. During that time period, Grandmother testified that neither Father nor Mother "ever complain[ed] about the care [Grandparents] were giving to J[.R.W.]." *Id.* at 24.

However, it is undisputed that since J.R.W. moved out of Grandparents' home in 2016, he has been living with Father and Stepmother.[9] After J.R.W. moved into Father's home, Grandmother testified that she "continue[d] her] involvement with [J.R.W.] on a frequent basis" by "taking [J.R.W.] off the bus and bring[ing] him to [her] house" when Father was working. *Id.* at 25. When both Father and Stepmother were working, which occurred "no more than two times a week," Grandmother testified that she would get J.R.W. off the bus, "bring him to her house and feed him dinner and he would spend the night [a]nd then she would get [J.R.W.] ready and take him to school the next morning." *Id.* at 25-26.

_____

[9] Throughout his entire life Parents have had sole physical and legal custody of J.R.W.

In ***Markham v. Wolf***, 136 A.3d 134 (Pa. 2016), our Supreme Court explained the foundation for determining standing:

> Standing in Pennsylvania is a jurisprudential matter. ***City of Philadelphia v. Commonwealth***, [] 838 A.2d 566, 577 ([Pa.] 2003). In our Court's landmark decision on standing, we explained that a person who is not adversely impacted by the matter he or she is litigating does not enjoy standing to initiate the court's dispute resolution machinery. ***William Penn Parking Garage v. City of Pittsburgh***, [] 346 A.2d 269, 280-81 (Pa. 1975) (plurality). This is consistent with our jurisprudential approach that eschews advisory or abstract opinions, but, rather, requires the resolution of real and concrete issues. As we explained in ***In re Hickson***, 821 A.2d [1238,] 1243 [(Pa. 2003)], the party to the legal action must be "aggrieved."
>
> **In determining whether a party is aggrieved, courts consider whether the litigant has a substantial, direct, and immediate interest in the matter**. To have a substantial interest, the concern in the outcome of the challenge must surpass "the common interest of all citizens in procuring obedience to the law." ***Id.*** An interest is direct if . . . the matter "caused harm to the party's interest." ***Id.*** **Finally, the concern is immediate "if that causal connection is not remote or speculative."** ***City of Philadelphia***, 838 A.2d [566,] 577 [(Pa. 2003)]. The "keystone to standing in these terms is that the person must be negatively impacted in some real and direct fashion." ***Pittsburgh Palisades Park, LLC v. Commonwealth***, []888 A.2d 655, 660 (Pa. 2005).

***Id.*** at 140. "An 'immediate' interest involves the nature of the causal connection between the action complained of and the injury to the party challenging it[; it] is shown where the interest the party seeks to protect is within the zone of interests sought to be protected by the statute or constitutional guarantee in question." ***South Whitehall Township Police***

***Service v. South Whitehall Township***, 555 A.2d 793, 795 (Pa. 1989) (citations omitted).

Thus, the question as to whether Grandparents are truly aggrieved—the touchstone of standing—is the heart of the matter on appeal. Simply put, do Grandparents currently have an immediate interest in the matter where, since 2016, their discharge of duties for J.R.W. has significantly changed?

Instantly, at the time Grandparents filed their custody complaint in April 2021, J.R.W. had been living with Father for almost five years and had not resided with Grandparents since September 2016, when he moved in with Father and started kindergarten. From September 2016 until the end of 2019, Grandparents provided after-school care for J.R.W. and occasionally kept him overnight. At that time, Parents had resolved their custody matter and were the sole legal and physical custodians of J.R.W. Since 2016, Parents have been amicably co-parenting J.R.W. ***See*** N.T. Standing Hearing, 4/23/21, at 37 (Grandmother agreeing that since 2016 Parents have repaired their relationship, co-parent very well together, and have "got[ten] better at working together."); ***see also M.W.***, ***supra*** at 1072 (efforts to usurp presumptively fit parent's rights to upbringing of his or her children subject to constitutional limitations).

In analyzing issues of third-party custody matters, courts of this Commonwealth have focused on a change in circumstances that occurs between the time a party has allegedly established standing to intervene/seek custody and when the party ultimately seeks to intervene. In ***M.W.***, ***supra***,

our Court was tasked with reviewing whether a trial court properly found a grandparent no longer had standing in a custody matter, under section 5324, where her grandchildren's dependency status had changed since the time grandparent flied her custody complaint. Focusing on the facts at the time of the custody conference, the trial court dismissed the grandparent's complaint because "[c]hildren were no longer dependent and were residing with Parents." *Id.* at 1068. On appeal, the grandparent argued that the trial court should have "looked back to the time she filed her complaint[, which was one year[10] before the custody conference,] to evaluate standing." *Id.* at 1071. In analyzing the issue and ultimately affirming the trial court, our Court recognized that "custody cases must be fluid under some circumstances." *Id.* 196 A.3d at 1071. Significantly, the panel noted that "this Court has 'reevaluated a party's standing following a factual change in circumstances, *i.e.*, the termination of parental rights or adoption.'" *Id.*

In *J.A.L.*, our court found that where the petitioner, who had lived with child's custodial parent, the petitioner's partner, as a "nontraditional family, for many years before the birth of the child[,] and[,] thereafter[,] the parties acted together to make arrangements for []artificial inseminations[,] . . . the child was to be a member of their nontraditional family, the child of both of them and not merely the offspring of [the custodial parent] as a single parent."

---

[10] In *M.W.*, grandparent filed her first petition to intervene in the dependency proceedings in September 2016. Grandparent later filed a complaint for custody in March 2017. The custody conference was held in April 2018.

*J.A.L.*, *supra* at 1321. In concluding that petitioner had standing to seek custody of child, our Court highlighted the fact that the petitioner's early contact with child

> was reinforced by visits after the parties' separation, visits which occurred with a frequency and regularity similar to that of post-separation visits by many noncustodial natural parents and[,] thus[,] must be considered adequate to maintain any bond previously created. The evidence at trial clearly established that [petitioner] ha[d] shown a constant, sincere interest in the child, and that the child recognize[d petitioner] as a significant person in her life.

*Id.* at 1322.

It is evident that in custody matters, courts evaluate the concept of standing on a fluid basis, which necessarily implicates the immediacy prong of a standing analysis—i.e., whether the interest the third-party seeks to protect is within the "zone of interests sought to be protected by our [custody] statute[s]," *South Whitehall Township*, *supra* at 795, and the constitutional right "to make decisions concerning the care, custody, and control of one's children [that] is one of the oldest fundamental rights protected by the Due Process Clause of the Fourteenth Amendment." *K.W.*, *supra* at 502-03. *See also C.G.*, *supra* at 898 ("The liberty interest . . . of parents in the care, custody and control of their children [] is perhaps the oldest fundamental liberty interest recognized by the Court").[11]

_____

[11] Similarly, in *C.G. v. J.H.*, 193 A.3d 891 (Pa. 2018), our Supreme Court acknowledged that it
*(Footnote Continued Next Page)*

As in **M.W.**, the circumstances pre-and-post 2016, with regard to Grandparents' discharge of duties for J.R.W., have significantly changed. Arguably, Grandparents stood *in loco parentis* during the time that they took care of J.L.W. on a daily basis from 2013-2016, a time when the child also lived exclusively with Grandparents at the acquiescence of parents. **See M.J.S. v. B.B.**, 172 A.3d 651 (Pa. Super. 2021) (*in loco parentis* status established where grandmother fed, bathed, and entertained child daily, attended doctors' appointments, and took child to class); **see also C.G.**, **supra** (recognizing relevant time frame to determine whether party stands i*n loco parentis* is when party developed relationship with child with acquiescence or encouragement of natural parent). However, since the fall of

_____

would be incongruous to ignore all post-separation conduct between a third-party and a child for the purpose of assessing whether the party stood *in loco parentis*, when the Adoption Act provides that a petition seeking involuntary termination of a natural or adoptive parent's rights may be filed if the parent has "evidenced a settled purpose of relinquishing parental claim to a child and has refused or failed to perform parental duties" for a period of at least six months preceding the filing of the petition. 23 Pa.C.S.[A.] § 2511(a)(1). **To render all post-separation conduct irrelevant would be to afford a person seeking *in loco parentis* standing, at any time, a greater advantage to a natural or adoptive parent even in the event the third party had demonstrated his or her relinquishment of parental claims to a child.**

**Id.** at 911 n.17 (emphasis added).

2016, Grandparents have not maintained that same "bond previously created." *J.A.L.*, *supra* at 1322.[12]

Under such circumstances, Grandparents simply do not have the requisite "immediate" interest necessary to establish standing.[13] Accordingly, we conclude that the trial court did not err in denying Grandparents standing where, at the time they filed their petition to intervene, Grandparents' duties were akin to those of occasional childcare providers. *See Argenio v. Fenton*, 703 A.2d 1042, 1044 (Pa Super. 2017) (court properly denied *in loco parentis* status to grandparent who provided daily childcare to grandchild where evidence did not show grandparent "intended to be bound to the legal duties and obligations of a parent"), *but see Liebner v. Simcox*, 834 A.2d 606 (Pa. Super. 2002) (where record supported finding that stepfather-petitioner maintained regular contact with child for three years following his separation from mother and, during that time, had custody of child when he had physical

_____

[12] At the 2016 custody trial between Father and Mother, the trial court resolved any question regarding whether Father abdicated his parental duties to Grandparents in Father's favor. *See* Trial Court Opinion, 9/12/16, at 2-7 (noting issues of credibility and weight of evidence decided by trial court in custody matters and finding Father fit and capable of making reasonable child rearing decisions and willing and able to provide for care of J.R.W.).

[13] As our Supreme Court noted in *C.G.*, *supra*, "[*i*]n loco parentis analyses are necessarily fact-intensive and case-specific inquiries[.]" *Id.* at 911. Here, we carefully craft our holding to apply to the specific timeline and facts of this case—where grandparents had not assumed parental status or discharged parental duties for J.R.W., for purposes of establishing *in loco parentis* status, for almost five years by the time they filed their petition to intervene.

custody of child's half-sister on alternating weekends and some holidays and vacations, petitioner established *in loco parentis* status).

Because the record supports the trial court's finding that Grandparents have not assumed parental status or discharged parental duties with regard to J.R.W.,[14] the court correctly determined that Grandparents did not stand *in loco parentis* to Child and, thus, properly denied their petition to intervene and grant standing.[15]   **T.B.**, **supra** at 916 ("An appellate court may not interfere with a trial court's factual conclusions unless they are unreasonable in view of the trial court's factual findings and[,] thus[,] represent an abuse of discretion.").

Order affirmed.[16]

---

[14] Our holding today does not speak to a situation where a grandparent seeks to establish standing for custody purposes when it is alleged that a child is at risk due to parental abuse, neglect, drug or alcohol abuse or incapacity.  Under such circumstances, a grandparent need not stand *in loco parentis* to the child to file a custody action.  **See** 23 Pa.C.S.A. § 5324(3)(i-iii)(B).

[15] Although not the focus of their argument on appeal, Grandparents are also unable to establish standing where Parents did not disagree as to whether Grandparents "should have custody," 23 Pa.C.S.A. § 5325(2)((ii), and where Grandparents failed to offer evidence showing that, within six months after J.R.W. lived with them continuously for at least 12 months and was removed from their home by Father, they filed an action.  **Id.** at §§ 5324(3)(iii)(C); 5325(3).

[16] We need not address Grandparents' claim that the trial court improperly interpreted **E.A.**, especially where any such analysis would amount to a mere advisory opinion.  **See Blumenstock v. Gibson**, 811 A.2d 1029, 1033 (Pa. Super. 2002) (we are not limited by trial court's rationale and may affirm its decision on any basis).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 03/09/2022